**CHAMPION OIL SERVICE COMPANY,**
Plaintiff-Appellee,

v.

**SINCLAIR REFINING COMPANY et al.,**
Defendants-Appellants.

No. 73–1835.

United States Court of Appeals,
Sixth Circuit.

Aug. 29, 1974.

George F. Karch, Jr., Cleveland, Ohio, for appellants; Gerald W. Simmons, Cincinnati, Ohio, John F. McLaren, Philadelphia, Pa., on briefs.

Irving I. Saul, Dayton, Ohio, for appellee; F. Bruce Abel, Cincinnati, Ohio, on briefs.

Before WEICK, LIVELY and ENGEL, Circuit Judges.

LIVELY, Circuit Judge.

In this private antitrust action the jury assessed damages of $989,457,

which amount was trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and judgment was entered in favor of the plaintiff for $2,968,371. On appeal it is claimed that the district court erred in failing to grant a directed verdict in favor of the defendants, in failing to make requested rulings on damage issues, in failing to instruct the jury on the defense of *in pari delicto* and, following the verdict, in denying the motion of the defendants for judgment notwithstanding the verdict.

Between 1946 and 1958 Champion Oil Service Company (Champion) had grown from a single service station to a successful independent marketer of petroleum products with an annual volume of over 5,000,000 gallons in Butler County, Ohio. Champion was able to sell petroleum products which were supplied by various oil companies under its own brand name at full prices in competition with nationally advertised brands. By 1958 Champion operated two bulk plants and twelve service stations in addition to servicing farm and commercial accounts and heating fuel oil customers. The principal officer of Champion was Glenn E. Douglass, its founder and the chief witness for Champion. Douglass testified that, although the business was successful, it had always operated in a tight working capital state. By 1958 Douglass perceived that the use of credit cards was becoming more widespread and that the highway building program would require an aggressive marketer of petroleum products to establish service stations at new locations. He testified that he felt he would be able to serve his area better if he were affiliated with one of the national oil companies.

Sinclair Refining Company was the marketing subsidiary of Sinclair Oil Corporation during the time relevant to this controversy. Subsequently there was a merger involving Atlantic Richfield Company, another defendant in the action. The defendants will be referred to collectively as Sinclair. Although Sinclair had operated for some 20 years in Butler County, Ohio prior to 1958, it had always been a substandard marketer with poor public acceptance in the area. In 1958 Champion had about 39 per cent of the independent jobbers' market in gasoline in the Butler County area and 48 per cent of the jobbers' market in fuel oil. This represented approximately 88 per cent of unbranded gasoline business in the area and 94.5 per cent of unbranded fuel oil business. Because of the strong position of Champion, representatives of a number of oil companies called on Mr. Douglass in 1958 suggesting affiliations between Champion and their employers. Douglass testified as to the decision to go with Sinclair, "We sort of selected them." He described various considerations which went into his decision to affiliate with Sinclair, but spoke primarily of the appeal of Sinclair's "estate building type of lease and leaseback." Under this program a Sinclair distributor could obtain financing to purchase land and build an equipped service station primarily on the basis of a long-term lease to Sinclair at a rental which covered the full cost of the property, improvements and fixtures.

Champion and Sinclair entered into a contract by which Champion became the Sinclair distributor in Butler County, Ohio for a period of one year beginning April 1, 1958 and continuing from year to year thereafter for a term not to exceed ten years, subject to the right of either party to terminate upon 60 days notice prior to any contract anniversary. Thereafter one existing station and six new service stations were leased to Sinclair for terms of 15 years. Each of the new stations was owned by Champion and was financed with a one hundred per cent bank loan covered by a 15-year mortgage that was coterminous with the lease to Sinclair. The rent which Sinclair agreed to pay Champion for each of the stations was the exact amount required to pay off the mortgage loan and the rents under each lease were assigned to the lending institution as additional collateral for the loan. These are re-

ferred to as base leases. Each base lease contained the following provision:

> If at any time during the term hereof Lessor [Champion], or, if there be more than one, any Lessor, shall be indebted to Lessee [Sinclair] on any account whatsoever, it is agreed that Lessee shall have the right to apply any accruing rental on said unpaid indebtedness, and that any amount so applied shall constitute rental payment hereunder.

Simultaneously with the execution of each base lease, the parties entered into a "station lease" by which Sinclair leased the same property back to Champion for a period of 15 years. The rent to be paid by Champion to Sinclair under the station lease was exactly the same as that due from Sinclair to Champion under the base lease. Champion as the owner of the stations had the obligation to pay taxes and insurance and at least part of the maintenance costs. Douglass testified that it was anticipated that these expenses would be paid out of the profits which Champion would realize in operating the stations under the sublease or station lease. Each station lease provided, however, that in the event of a termination of the distributor agreement between Sinclair and Champion "then Lessor shall have the option of cancelling and terminating this Lease by written notice to such effect to Lessee." Counsel for Champion examined and approved all of these documents.

Despite its adoption of the Sinclair brands and emblems and the expansion to new outlets, Champion did not increase its gallonage in proportion to its growth in capital commitments and operating overhead. In fact, its small profits turned into losses and its operating costs continued to climb. By 1963 Champion was seeking a means of refinancing its operations, and Glenn Douglass testified that use of the equity which had built up in the financed service stations was necessary to achieve any relief by way of refinancing. Eventually Douglass requested that Sinclair make a loan to Champion of approximately $700,000, with the proceeds being used to pay off all existing bank mortgages on station properties and other obligations of Champion and providing $50,000 of working capital. Douglas testified that after a number of sessions with various representatives of Sinclair he was advised in August 1965 by Harry Young, the regional manager of Sinclair, that the loan would not be made. The witness testified that he told Mr. Young in the same conversation that since the loan would not be made Champion requested that it be released "from all of our documents, our leases and our sales contracts so I could take this package elsewhere and survive." He states that Harry Young told him that "[H]e would not do that" and that this was the end of the conversation. Later another representative of Sinclair suggested that Champion turn over to Sinclair ten of the stations which it was operating. These were the six original Sinclair stations and four of Champion's financed stations. This was eventually done and the release of the four owned stations plus the sale of equipment and merchandise in all ten reduced the rental load and provided Champion with cash which it needed to pay off some of its pressing obligations.

In January 1966 Champion served notice of its intention to cancel the distributor supply contract effective at the end of March of that year. Douglass testified that he contacted a number of other oil companies with the idea of obtaining financing from one of these companies and in turn becoming its distributor. He said that he "felt" that some supplying company would be interested in taking over the leases and the bank loans and stepping into Sinclair's shoes. On the other hand, he testified that if this were not possible, he was interested in selling the seven Champion-owned stations to someone as an investment and tying up with another oil company "like Sun" so that Champion could pay a better rental to the investor-purchaser. Champion continued to operate as a job-

ber-distributor of Sinclair products on a month-to-month basis after the termination of the distributorship contract. During this time it continued to operate the three remaining financed stations. Sinclair continued to pay the rent on the four Champion-owned stations which it had taken over, and the equity of Champion in the seven stations continued to increase. Although Douglass testified on one occasion that he could not get financing because the money market was tight, it was his thesis throughout his testimony that the refusal of Sinclair to release the base leases on the seven financed service stations prevented Champion from salvaging its business. This assertion was based on the witness' opinion after a lifetime in the business of distributing petroleum products that no other oil company would finance him so long as Sinclair controlled the desirable locations represented by the seven financed stations. His son testified to the same effect.

On cross-examination it was brought out that, except for financial resources, Champion was stronger than Sinclair in relation to the distributorship arrangement entered into in 1958. Sinclair had never done well in Butler County, Ohio and Champion was a major factor in the independent sector of the petroleum business of the area. This was emphasized by evidence that Champion had insisted on ten conditions being met by Sinclair prior to agreeing to become a Sinclair distributor. Later, when Champion was trying to make a change, both Cities Service Company and Sun Oil Company declined Champion's requests for financial assistance because of its burdensome debt structure and unprofitable operating experience without reference to the refusal of Sinclair to release the base leases on the seven service stations. It was testified that Champion purchased petroleum products from Tresler Oil Company at Cincinnati during the entire time that it was a distributor of Sinclair products and that some sort of financial help was offered by Tresler. Douglass admitted that he had put second mortgages on all of the financed service stations, but stated that Champion had not realized capital, but had used these mortgages to secure prior indebtedness. At one point near the end of Champion's relationship with Sinclair, Champion was purchasing 98 per cent of the petroleum products which it sold from suppliers other than Sinclair. Sinclair had put Champion on a C.O.D. basis while other suppliers in the territory were still willing to sell to Champion on credit. Douglass admitted that the Ohio manager of Sinclair told him to find another supplier and that he "assumed" that there would be an agreement freeing the three remaining service stations from the base lease to Sinclair.

Glenn Douglass testified that he did not blame Sinclair for the financial problems of Champion, but his complaint was that Sinclair's refusal to release the base leases prevented Champion from using its own properties to extricate itself from its financial difficulties. It was stated that increased gallonage was the only way that Champion could salvage its business. The fixed charges and operating costs would not increase with greater gallonage, and the profits would improve dramatically according to witnesses for Champion. Douglass testified that Sun Oil Company was second in Ohio in the marketing of petroleum products and that if Champion had been able to borrow $350,000 it would have been able to enter into a distributorship with Sun which would have been profitable enough to have enabled it to salvage its operations. While Douglass maintained that the needed $350,000 would have been available except for the base leases to Sinclair, the Sun Oil Company employee who had negotiated with Douglass was not asked if these leases stood in the way of Sun's competing for the Champion business.

The district judge required extensive pretrial proceedings and these effectively narrowed the issues in the case. The court granted partial summary judgment in favor of Sinclair which removed

from the case issues based on alleged *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14. He also ruled that the requirements contract between Champion and Sinclair, standing alone, could not be treated as a violation of the antitrust laws since there was no claim of any causal connection between the plaintiff's asserted damages and this contract. As the evidence showed, Sinclair never insisted that Champion purchase all its requirements from Sinclair. In the opinion issued in connection with the summary judgment ruling the district court stated that the only issues for the jury "are whether or not the leaseback, either alone or in combination with the lease and requirements contract, constituted an unreasonable restraint of trade under § 1 of the Sherman Act; and also whether or not the combination between Sinclair and Champion is an unreasonable restraint of trade under § 1 of the Sherman Act." The plaintiff has not appealed from the partial summary judgment.

 The first question to be answered on appeal is whether Sinclair was entitled to a directed verdict on the ground that Champion failed to prove a prima facie case of unreasonable restraint of trade within the meaning of § 1 of the Sherman Act. In denying Sinclair's motion for a directed verdict the District Judge remarked:

> I don't want you to get your hopes up just because the case is going to a jury. I will be very frank with you. I don't see any evidence of intent to injure competition. I don't see any evidence of unreasonable restraint of trade, and I see no evidence on which a jury could properly base a verdict on the issue of causation.

In considering a district court's denial of a directed verdict and judgment notwithstanding the verdict we must "view the evidence in the light most favorable to [Champion] and . . . give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." Continental Ore Company v. Union Carbide & Carbon Corporation, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); Fortner Enterprices, Inc. v. United States Steel Corporation, 452 F.2d 1095 (6th Cir. 1971), ·cert. denied, 406 U.S. 919, 92 S.Ct. 1773, 32 L.Ed.2d 119 (1972). Sinclair contends that since there was no *per se* violation of the Sherman Act the "rule of reason" controls and that under this rule there must be a showing of an adverse impact on the market place for otherwise legal acts to be held to constitute unreasonable restraint of trade. Reliance is placed on Elder-Beerman Stores Corporation v. Federated Department Stores, Inc., 459 F.2d 138 (6th Cir. 1972). In *Elder-Beerman*, we were dealing with a claim that exclusive supply agreements between a supplier and a seller were used in an attempt to monopolize the department store business in Dayton, Ohio. The majority of the court panel held that the plaintiff failed to establish the single conspiracy upon which it had based its claim for damages. If Champion's claim in the present case were based solely on the exclusive supply arrangement between it and Sinclair, *Elder-Beerman* might require reversal. However, Champion claims that the unreasonable restraint of trade did not result from the requirements contract alone and the district court so ruled in granting partial summary judgment. It is the position of Champion that it was the intention of Sinclair to control Champion's portion of the Butler County petroleum products business by obtaining 15-year leases on Champion's prime service station sites, which leases had no escape clause, while at the same time leasing the stations back to Champion under an instrument which provided that the leaseback could be cancelled upon termination of the distributorship agreement. This intention

was realized, says Champion, when Sinclair refused to release the stations, making it impossible for Champion to deal with a Sinclair competitor. Thus there are factors in this case which require us to look beyond *Elder-Beerman* and other cases dealing with exclusive supply agreements.

Sinclair also cites Fortner Enterprises, Inc. v. United States Steel Corporation, *supra*, a case dealing with a "tying arrangement." The district court correctly held that this is not a true "tying" case, and this question is not before us since there was no appeal from the partial summary judgment.

Further reliance is placed on this court's opinion in Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). Champion responds that this case involves much more than a refusal to deal with a party who desires to be a customer of the manufacturer, which was the basic complaint in both *Elder-Beerman, supra* and *Ace Beer, supra.* Champion maintains that the inherent perniciousness of the lease/leaseback/distributorship arrangement is evidenced by the fact that the only terms under which it could sever relations with Sinclair left it stripped of control over the financed service stations, without which it was impossible to deal with a Sinclair competitor.

Sinclair relies upon Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), where the Supreme Court held that the Sherman Act never applies unless there is some form of restraint upon commercial competition in the marketing of goods or services. The purpose of the Act was stated by the Court in this language:

The end sought [by the Sherman Act] was the prevention of restraints to free competition in business and com-mercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services . . . 310 U.S. at 493, 60 S.Ct. at 992.

In addition Sinclair cites Cartrade, Inc. v. Ford Dealers Advertising Association of Southern California, 446 F.2d 289 (9th Cir. 1971), cert. denied, 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972), for the proposition that where there is no evidence that a decision to terminate a relationship is made for anti-competitive reasons the complaining party has failed to prove a prima facie case of violation of the Sherman Act.

Sinclair contends that Champion's failure to secure a distributorship with another oil company could not possibly have affected competition because at least 17 oil companies were operating in Southwestern Ohio, the area Sinclair maintains should be considered rather than just Butler County. The total gallonage for the area in 1965 was 611,376,907. Champion's total gallonage for 1965–66 was considerably less than one percent of the total. In Tampa Electric Company v. Nashville Coal Company, 365 U.S. 320, 327–328, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the Court held that three determinations are necessary for finding that an exclusive dealing contract or arrangement constitutes an anti-trust violation. It was said that the court must determine the line of commerce involved, the area of effective competition and that the competition foreclosed by the arrangement constitutes a substantial share of the relevant market. Sinclair maintains that there was no showing of any substantial effect on the relevant area of effective competition and for this reason the case should not have been submitted to the jury.

We conclude that the district court should have granted Sinclair's mo-

tion for a directed verdict. There was no direct evidence, or evidence from which it could properly be inferred, that any other oil company refused to refinance Champion and accept it as a distributor because of the existence of the lease/leaseback agreements. To the contrary, the evidence is overwhelming that the refusals were based on the poor financial condition of Champion and its inability to reduce operating expenses—the very considerations which caused Sinclair to put it on a C.O.D. basis. The estate building features of the lease/leaseback arrangement appear to have been the chief reason for Champion's decision to affiliate with Sinclair. During the entire time of deteriorating relations between the parties Sinclair continued to pay rent on the seven stations which Champion owned and had financed through the arrangement of which it now complains. For a portion of the time four of these stations were being operated by Sinclair rather than Champion, but Champion was building equity in them. Because of this growth in equity Champion was able to secure some financial relief by placing second mortgages on this real estate which had originally been encumbered with mortgages representing its full value.

The district court correctly determined that there was no *per se* violation of the Sherman Act and that the case did not involve an illegal tying arrangement. We find that there was no proof that the contracts and leases complained of were designed to, or did in fact, suppress interbrand competition, or otherwise result in unreasonable restraint of trade. Such proof is required in non *per se* cases. Because of our disposition of this issue we do not reach other questions which the parties have argued on appeal.

The judgment of the district court is reversed and the cause is remanded with instructions to enter judgment notwithstanding the verdict dismissing the complaint.