**Stanley MOGUL and Nathan Levin**
**v.**
**GENERAL MOTORS CORPORATION et al.**
**Civ. A. No. 71-2195.**

United States District Court,
E. D. Pennsylvania.

April 10, 1975.

W. Bradley Ward, Philadelphia, Pa., for defendant.

Jerome E. Bogutz, Philadelphia, Pa., for plaintiffs.

## OPINION

LUONGO, District Judge.

Plaintiffs, Stanley Mogul and Nathan Levin, instituted suit against General Motors Corporation (GMC) and the Paul J. Schneider Company (Schneider Company) [1], charging violations of the Sherman Antitrust Act, 15 U.S.C. § 1, et seq., arising out of GMC's refusal to approve transfer of a Cadillac-Oldsmobile dealership from Schneider Company to plaintiffs. GMC has moved for summary judgment in its favor pursuant to Rule 56(b), F.R.Civ.P., based upon

pleadings, depositions and supporting documents already filed.

In a motion for summary judgment, all doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. First Pa. B. & T. Co. v. United States Life Ins. Co., 421 F.2d 959 (3d Cir. 1969), reh. denied December 10, 1969. GMC acknowledges that principle, but asserts that, with respect to the allegedly material issues of fact (a) plaintiffs have failed to present sufficient evidence in advance of trial to show that there are genuine issues of fact, and (b) in the alternative, even if plaintiffs have presented enough evidence to present genuine issues of fact, they are not material issues.

The first part of GMC's alternative argument is based upon Rule 56(e), which provides:

" . . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Although summary judgment should be used sparingly in antitrust cases, Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), under this provision of Rule 56, the non-moving party is under the duty to produce significant probative evidence tending to support the complaint or suffer entry of summary judgment. First National Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 288–90, 88 S. Ct. 1575, 20 L.Ed.2d 569 (1968); Chapman v. Rudd Paint & Varnish Company, 409 F.2d 635, 643–4 (9th Cir. 1969); McGuire v. Columbia Broadcast-

---

1. Also named as defendants were Paul J. Schneider and Irma Schneider, his wife. By order dated May 2, 1972, the complaint against the individual defendants was dismissed for lack of jurisdiction.

ing System Inc., 399 F.2d 902, 905 (9th Cir. 1968).

GMC argues that the evidence which plaintiffs have produced on the alleged issues of fact is neither "significant", nor "probative", and consequently plaintiffs have failed to sustain their burden to show that there are genuine issues of fact for trial. Although there is considerable merit in this aspect of GMC's argument, it will not be necessary to decide whether plaintiffs have produced such evidence since, in my view, even if all the alleged issues of fact are resolved in plaintiffs' favor, GMC is entitled to judgment, i e., the issues of fact are not "material." In the recitation of facts, therefore, wherever the parties are in disagreement, the facts will be resolved, and all inferences will be drawn, in plaintiffs' favor.

## FACTS

GMC, through various separate divisions (Cadillac, Oldsmobile, Buick, Chevrolet, Pontiac), manufactures several makes and models of autombles. The automobiles are distributed by each division through a dealer-franchise system set up by regions and zones. Dealer distribution points for each division are located within regions, and zone managers select dealers to operate the facilities. Dealers are independent businessmen who purchase automobiles from the appropriate GMC division and resell them to the public. There are no territorial or price restrictions on the dealers' right to resell automobiles.

The franchise agreement between GMC and its dealers is embodied in its uniform Dealer Selling Agreement. Among other provisions, the Dealer Selling Agreement prohibits the transfer of ownership, financial interest or active management in any dealership without the written approval of the appropriate GMC division. Each dealer controls the assets of his dealership, and is free to sell or otherwise dispose of the dealership assets (including buildings and equipment) as he sees fit, but normally such assets cannot be disposed of at full value unless the appropriate GMC division approves transfer of the dealer franchise to the prospective purchaser.

In July 1969, Mogul and Levin were approved by the Oldsmobile division of GMC to operate a dealership (Rallye Oldsmobile, Inc.) in Coatesville, Pennsylvania. In early 1970, they decided to dispose of their interest in Rallye Oldsmobile and seek a larger dealership.

In April 1970, plaintiffs learned that Paul J. Schneider (Schneider), owner of Schneider Company, a Cadillac-Oldsmobile dual dealership in Doylestown, Pennsylvania, was about to dispose of his dealership because of failing health. Plaintiffs entered into negotiations with Schneider with the view to acquiring the dealership assets of Schneider Company. While such negotiations were going on, plaintiffs entered into an agreement, dated May 29, 1970, to sell their stock in Rallye Oldsmobile, Inc. to one Ted Harrison, subject to the approval of Oldsmobile division of GMC. By letter of intent dated June 8, 1970, plaintiffs advised Oldsmobile division of their agreement with Harrison.

Donald J. Salmeri, then Philadelphia Zone Manager for Oldsmobile division, was aware of plaintiffs' interest in and negotiations for the Schneider Company agency commencing in April 1970. During the period March-June, 1970, however, Salmeri was considering one Joseph H. Higgins for a Cadillac-Oldsmobile dealership at Manahawkin, New Jersey, or for the Schneider Company agency at Doylestown. Higgins was an attorney and a former New Jersey Assemblyman whose experience in the automobile business was somewhat limited. At Salmeri's suggestion, Higgins visited Schneider on June 25, 1970 and informed Schneider that he had been sent by Salmeri to take a look at the dealership. Higgins' visit prompted Schneider to call plaintiffs and advise them that if they wanted to buy, they would have to conclude their negotiations immediately. This led to the preparation and execution of a handwritten document, dated June 26, 1970, by which plaintiffs agreed to

purchase the assets of Schneider Company. The agreement provided, *inter alia*, that it was subject to (1) plaintiffs' arranging necessary financing, and (2) approval by the Cadillac and Oldsmobile divisions of GMC. Upon failure of either condition, the $20,000 deposit paid at signing was to be returned.

At some time between June 29 and July 8, the June 26, 1970 agreement along with plaintiffs' Dealer Selling Agreement applications and Source of Fund Statements, were tendered to and rejected by Salmeri.[2] On July 8, 1970, Schneider signed a letter of intent, addressed to Salmeri at Oldsmobile, advising of his agreement to sell the assets of Schneider Company to plaintiffs. Mogul and Levin delivered that letter on the same day to James Powers, Assistant Zone Manager. The next day, July 9, plaintiffs met with Salmeri and were advised that, because they were still the owners of the Coatesville dealership, they would not be considered for the Schneider Company dealership, although they would be considered for an Oldsmobile location in Upper Darby.

On July 31, 1970, Salmeri advised Schneider that Higgins was the preferred candidate and suggested they try to arrange a sale. Thereafter Schneider conducted negotiations and entered into agreements with Higgins. During the same perod of time, however, he also entered into agreements with one Joseph Walier, and with Walier and Fred J. Sumption. On August 27 Schneider's counsel informed Mogul and Levin that if proof of GMC's approval was not submitted within ten days, the June 26, 1970 agreement would be set aside. In early September plaintiffs were finally permitted to submit an application for the Doylestown dealership, but Salmeri informed them they were not the preferred applicants for that location. Finally, on September 17, 1970, at Salmeri's direction, Schneider wrote a letter to Salmeri stating that he favored Higgins as the purchaser of the assets of Schneider Company. The terms of the agreement with Higgins were generally the same as with Mogul and Levin. Schneider would nevertheless have preferred to sell to plaintiffs but felt that, since Salmeri favored Higgins for the dealership, if he (Schneider) wanted to sell at all, he would have to sell to Higgins.

On September 10 and again on October 27, 1970, Schneider's counsel advised plaintiffs that the agreement of June 26, 1970 was null and void for failure to obtain approval of Cadillac and Oldsmobile. Having been advised by Salmeri that unless a release was obtained from Mogul and Levin, no sale would be approved, Schneider requested, and received from plaintiffs, a release before returning the $20,000 deposit. The release signed by Mogul and Levin was dated November 9, 1970, and named Schneider Company, Paul and Irma Schneider and "all other persons, firms or corporations . . . .",[3] releasing them from all claims arising out of the agreement of June 26, 1970. Thereafter, GMC approved transfer of the franchise to Higgins and, on February 29, 1971, the Schneider Company assets were transferred to Higgins.

## DISCUSSION

Plaintiffs' suit charges violations of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. Section 1 declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . .", and § 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any

---

2. In the case of dual dealership, it was the practice for one of the GMC divisions involved to serve as the lead agency. In this case, Oldsmobile was the lead agency and Salmeri was acting for both Oldsmobile and Cadillac.

3. Because of the disposition of the antitrust claims, it will not be necessary to consider and decide GMC's contention that the release bars all claims, including antitrust claims against GMC as well as claims against the named releasees.

part of the trade or commerce among the several States . . . ."

Plaintiffs contend that GMC, Schneider and Schneider Company conspired to prevent plaintiffs from obtaining the franchise to operate the Doylestown dealership; that their actions constituted a concerted refusal to deal with plaintiffs; and that their conduct was either an unlawful restraint of trade or an unlawful attempt to monopolize, or an exercise of monopolistic power over, a relevant segment of the automotive market.

### Section 1 Claim—Restraint of Trade

■■ Despite the absolute language of § 1 only contracts or combinations which "unreasonably" or "unduly" restrain trade are prohibited. Standard Oil Company v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). There are exceptions to the "rule of reason" announced in *Standard Oil*. Some arrangements have such an obvious effect on competition that they are conclusively presumed to be illegal, i. e., are *per se* violations of the Act. Such arrangements include price fixing agreements, division of markets among competitors, tying arrangements, and collective refusals to deal, or "group boycotts." See E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee, 467 F.2d 178 (5th Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

The *McQuade* court analyzed the cases applying the *per se* rule to collective refusals to deal and placed them in three categories, those involving (1) "horizontal combinations among traders at one level of distribution, whose purpose was to exclude direct competitors from the market", citing, e. g., Eastern States Retail Lumber Dealers Assoc. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L. Ed. 1490 (1914), and Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); (2) "vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combina-

tion", citing, e. g., Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) and Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); and (3) "combinations designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors", citing, e. g., Fashion Originators Guild of America v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). The court in *McQuade* then went on to state, 467 F.2d at 187:

"In all of these cases, the touchstone of *per se* illegality has been the purpose and effect of the arrangment in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as 'naked restraints of trade,' and have fallen victim to the *per se* rule. On the other hand, where these elements have been missing, the *per se* rule has not been applied to collective refusals to deal. See, e. g., Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 9th Cir. 1969, 416 F.2d 71, cert. denied 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) . . . We conclude that resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question is a 'naked restraint of trade.' Absent these factors, the rule of reason must be followed in determining the legality of the arrangement."

■ It is at once apparent that the instant case falls into none of the categories of cases listed in *McQuade* as concerted refusals to deal which have been held to be *per se* violations. It seems to fit instead into the "rule of reason" category, of which Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), is an outstanding and often cited example. In *Seagram,* plaintiff Hawaiian Oke was the sole distributor of several of the products man-

ufactured and sold by defendants Seagram & Sons, Inc. and Barton Distillery Company. There was evidence that it was desirable to market the Seagram and Barton products in combination. Defendant McKesson and Robbins, Inc., which was also in the distributing business, solicted both Seagram and Barton for, and obtained from them, the distribution rights previously enjoyed by Hawaiian Oke. Judgment was entered on the jury's verdict in favor of Hawaiian Oke. The Court of Appeals reversed with directions to dismiss the action, ruling that there was no *per se* violation and that, in the absence of evidence of some forbidden or anti-competitive motive, there was no evidence to support a finding of any unreasonable restraint of trade in defendants' conduct toward Hawaiian Oke.

The principal holding *Seagram* was summarized thus by the Court of Appeals for the Third Circuit in Ark Dental Supply Company v. Cavitron Corporation, 3 Cir., 461 F.2d 1093, 1094 (1972):

"In a thorough and well-researched opinion, the court, speaking through Judge Duniway, held that it is indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A."

The principle was reiterated by the Ninth Circuit in Ricchetti v. Meister Brau, Inc., 9 Cir., 431 F.2d 1211, 1214 (1970), cert. denied, 401 U.S. 939, 91 S. Ct. 934, 28 L.Ed.2d 219 (1971):

"It is well established that a manufacturer or producer has the right to deal with whom he pleases and to select his customers at will, so long as there is no resultant effect which is violative of the antitrust laws. Thus, a manufacturer may discontinue a relationship, or *refuse to open a new relationship for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade or competition.* United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969); Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918, 921 (9th Cir. 1968); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 286–287 (6th Cir. 1963); Timken Roller Bearing Co. v. Federal Trade Commission, 299 F.2d 839 (6th Cir. 1962), cert. denied, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 .(1962); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir. 1962)." (Emphasis added)

See also Champion Oil Service Co. v. Sinclair Refining Co., 502 F.2d 709 (6th Cir. 1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1131, 43 L.Ed.2d 401 (1975); Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637 (10th Cir. 1973), cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L. Ed.2d 965 (1973); Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972); Alpha Distributing Co. of Cal., Inc. v. Jack Daniel Distillery, 454 F.2d 442 (9th Cir. 1972), cert. denied, 419 U.S. 842, 95 S. Ct. 74, 42 L.Ed.2d 70 (1974); Beckman v. Walter Kidde & Co., 451 F.2d 593 (2d Cir. 1971), affirming 316 F.Supp. 1321 (E.D.N.Y.1970), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972); Beverage Distributors Inc. v. Olympia Brewing Co., 440 F.2d 21 (9th Cir.), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); Daily Press, Inc. v. United Press International, 412 F.2d 126 (6th Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); Varney v. Coleman Company, Inc., 385 F.Supp. 1337 (D.N.H. 1974); Marder v. Conwed Corp., 378 F. Supp. 109 (E.D.Pa.1974); Bay City-Abrahams Bros., Inc. v. Estee Lauder Co., 375 F.Supp. 1206 (S.D.N.Y.1974).

I am assuming, for purposes of this summary judgment motion, that there was an agreement between GMC

and Schneider[4] to favor Higgins, but there is no evidence whatsoever that the agreement was an illegal one in restraint of trade. Although this suit has been pending for more than three years, during which time the parties have engaged in extensive discovery,[5] plaintiffs have failed to produce any evidence to support even an inference that GMC's refusal to award the Doylestown franchise to them was motivated by an anti-competitive purpose or had an anti-competitive effect.

Plaintiffs concede that GMC, acting alone, could refuse to grant the Doylestown dealership to them. They contend that GMC's absolute right to select a dealer becomes inapplicable when it is arrived at as a result of an agreement or conspiracy, such as plaintiffs contend existed between GMC and Schneider. The teaching of Seagram v. Hawaiian Oke and a number of the other cases cited above is that an agreement between the manufacturer and the new distributor, without more, to terminate the old distributor is neither a *per se* nor a rule of reason violation. Thus, by analogy, in the instant case, even if Higgins, the new dealer (distributor), had agreed ("conspired") with GMC, or had coerced GMC by some unspecified, but hinted at, political pressure to have the Doylestown franchise awarded to him rather than Mogul and Levin, there would be no violation of the Sherman Act. A *fortiori*, an agreement between the manufacturer and the old dealer as to the selection of the person to take over the old dealer's business cannot be a violation of Section 1 of the Act in the absence of a showing of anti-competitive motive or effect. Here the old dealer (Schneider) was leaving the automobile business and would in no sense be a competitor of the new dealer.

■ The only anti-competitive effect alleged by plaintiffs is that they were

denied the Doylestown dealership, but this is an effect which is inherent in the selection of one from a group of applicants. At oral argument it became apparent that plaintiffs' real claim is that, although GMC has the right to select its dealers, it must establish criteria for selection, consider all applicants on the basis of such criteria and make its selection on a fair and equitable basis. Plaintiffs' counsel candidly conceded that there is no direct support in the decided cases for this novel "commercial due process" theory of violation of the antitrust laws, but contended that there is tangential support in the cases. My review of the cases fails to reveal any support, direct, indirect or tangential, for the "commercial due process" concept, consequently plaintiffs' claims that they were more qualified, financially and by experience than Higgins, and that Higgins' selection was politically motivated, present no material issues for trial.

GMC's failure to establish criteria for the selection of its dealers, and its failure to deal on a "fair and equitable" basis with plaintiffs' attempts to acquire the Doylestown dealership does not state a claim of violation of Section 1 of the Sherman Act under either the *per se* or the rule of reason test.

*Section 2 Claim—Monopolization*

Section 2 of the Sherman Act prohibits all monopolies and every attempt or conspiracy to monopolize commerce. Plaintiffs' arguments in this area are not too clear, but it appears that they contend that GMC either exercised a monopoly or attempted or conspired to exercise a monopoly over a portion of the automobile market by refusing to deal with plaintiffs for a Cadillac franchise.

■■ Monopoly power has been defined as the power to control prices or exclude competition. United States v.

---

4. All the evidence is to the contrary. Schneider wanted to deal with plaintiffs, but was prevented from doing so because GMC preferred Higgins for the Doylestown agency.

5. At oral argument on this motion, plaintiffs' counsel was granted an additional two weeks in which to depose two additional potential witnesses, but counsel later advised the court and opposing counsel that he had decided not to do so.

duPont & Co., 351 U.S. 377, 391, 76 S. Ct. 994, 100 L.Ed. 1264 (1956); see also United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Every manufacturer has a monopoly over his own product. This is especially true when the products are sold under a trademark or tradename such as GMC uses in marketing Cadillacs. United States v. duPont, *supra*, 351 U.S. at 392–3, 76 S.Ct. 994; Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336 (9th Cir. 1970). As the Supreme Court stated in *duPont*, 351 U. S. at 393, 76 S.Ct. at 1006:

"This power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly."

Unless the manufacturer makes use of his natural monopoly to gain control of the relevant market in which his product competes, there is no antitrust violation. Bushie v. Stenocord, *supra*, 460 F.2d at 120.

■■■ Plaintiffs contend that the Cadillac automobile represents more than a brand monopoly, that it is so unique a product that it constitutes the relevant product market by itself.[6] The Supreme Court stated in *duPont*, 351 U.S. at 395, 76 S.Ct. at 1007:

"In considering what is the relevant [product] market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal."

See also United States v. Grinnell, 384 U.S. at 571, 86 S.Ct. 1698.

The District of Columbia Circuit in Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, cert denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), applied this test in holding that there was no monopoly or attempt to monopolize in the cancellation of an automobile distributorship agreement because automobiles produced by other manufacturers were reasonably interchangeable with and served the same purpose as the Packard. In Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D. Pa.1968), affirmed, 417 F.2d 622 (3d Cir. 1969), another case in which a dealer franchise was terminated, the court directed a verdict on the monopolization claim because it found that Chrysler did compete with Ford, GMC and other automobile manufacturers. In the instant case, I may, and do, take judicial notice that the relevant product market cannot be limited to Cadillac. The Cadillac is interchangeable with other luxury automobiles on the market which serve the same purpose and, in addition, it competes with even the less expensive models of automobiles in serving the consuming public's transportation needs and desires. Cadillac division of GMC has neither the power to fix prices nor the power to exclude competition from manufacturers of other luxury automobiles, or of all other types of automobiles in the relevant market.

■■■ The remaining charge is that GMC attempted to monopolize a segment of the market through its Cadillac division. The necessary elements of an attempt to monopolize include a specific intent to monopolize and a showing of a dangerous probability that the attempt will succeed. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S. Ct. 276, 49 L.Ed. 518 (1905); American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951). There is a split of authority as to whether proof of a dangerous probability of success of the mo-

---

6. No similar claim was made with respect to products of the Oldsmobile division.

nopoly in a relevant market is essential to prove either an attempt or a conspiracy to monopolize, see Woods Exploration & Pro. Co. v. Aluminum Co. of America, 438 F.2d 1286, 1304 fn 7 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), and cases cited therein; compare Hallmark Industry v. Reynolds Metals Company, 489 F.2d 8 (9th Cir. 1973), cert. denied, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974), with Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203 (5th Cir. 1969), and see Rea v. Ford Motor Company, 497 F.2d 577, 590 footnote 28 (3d Cir.), cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974), but it is unnecessary to resolve the conflict. Plaintiffs have presented no evidence at all tending even slightly to show that the refusal to grant them the Cadillac franchise represented an attempt by GMC to monopolize any part of the automobile market. The contentions made in support of the monopoly claim are, in essence, restatements of the Section 1 restraint of trade claims already discussed and rejected. While it is true that evidence tending to establish a conspiracy to restrain trade might also establish an attempt or conspiracy to monopolize under Section 2, Bushie v. Stenocord, *supra*, 460 F.2d at 120–121; Industrial Building Materials v. Interchemical Corp., *supra*, 437 F.2d at 1344, since the restraint of trade claim has been found deficient as a matter of law, it cannot be used to support a claim under Section 2 of the Act.

■ The basic weakness in plaintiffs' argument on the monopoly point is the inability to establsh a relationship between the method of selection of a dealer, and GMC's ability to control prices or competition. Even if one were to accept plaintiffs' assertion that the Cadillac automobile, by reason of its uniqueness and desirability, is the relevant product market, there is no suggestion as to how the *identity* of a particular dealer (franchisee) can possibly ef-

fect the degree of GMC's monopoly over its product.

GMC's motion for summary judgment will be granted.