**V. & L. CICIONE, INC., et al.**

**v.**

**C. SCHMIDT & SONS, INC. and Wm. H. Pflaumer & Sons, Inc.**

**Civ. A. No. 73–1804.**

United States District Court,
E. D. Pennsylvania.

Oct. 29, 1975.

John T. Clary, Philadelphia, Pa., for plaintiffs.

Charles I. Thompson, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

This is an antitrust action alleging violations of the Sherman Act brought by the plaintiff, a beer distributor, whose dealership was terminated by the defendant brewery. It comes before the Court on the motion of defendant C. Schmidt & Sons, Inc. for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This motion for summary judgment is submitted upon the pleadings, depositions, affidavits, exhibits and answers to interrogatories. For the reasons expressed hereinafter, this Court has concluded that even when all the issues of fact are resolved in favor of plaintiff Cicione, defendant Schmidt is entitled to judgment; accordingly, its motion for summary judgment is granted.

The following facts have been stipulated by the parties.[1] Plaintiff V. & L. Cicione, Inc. ("Cicione"), defendant C. Schmidt & Sons, Inc. ("Schmidt") and Wm. H. Pflaumer & Sons, Inc. ("Pflaumer)[2] are all Pennsylvania cor-

---

1. *See*, pre-trial order, III–A.

2. Pflaumer is no longer a party to the litigation. This Court has approved a stipulation of the parties dismissing it from this case.

porations with their principal places of business in Philadelphia, Pennsylvania. During the period in question in this case, both Cicione and Plfaumer were distributors of beer for Schmidt, a regional brewer.

The sale of beer in Pennsylvania is extensively regulated by law. All those who participate, whether as brewers, distributors, or retailers, must be licensed by the State. There are two classes of licensed distributors: "D" and "ID" distributors. Both classes of distributors can resell to taverns and the public. However, under the law a "D" distributor cannot resell to another distributor, whereas an "ID" distributor can do so. Consequently, if a brewer wishes to have a distributor who can "wholesale" to other distributors, he must appoint an "ID" distributor. For this reason, "ID" distributors are usually larger distributors who resell to other distributors, taverns and the public, while "D" distributors are usually smaller and resell only to taverns and the public.

Under the Pennsylvania Liquor Code, when a brewer designates a distributor as a "primary or original supplier" of the brewer's beer (as Schmidt did with its distributors in 1969), the brewer is required by law to also designate a territory within which the distributor can resell the beer; the distributor is prohibited by law from reselling outside that territory. In 1969, and until 1971, Schmidt's distributors operated under "territorial letters" giving them the right to resell throughout the entire City of Philadelphia. Beginning in 1971, the distributors operated under limited "territorial letters" which gave each distributor a specific limited territory within the City. Since 1971, Cicione's area, in general, has been South Philadelphia and Pflaumer's, Northeast Philadelphia. However, In August, 1973,

Cicione's franchise was terminated [3] by Schmidt.

There appear to be several genuine issues of material fact which must be decided if this case goes to trial. In its pre-trial order, Cicione has set out the contested facts that it intends to prove at trial with some specificity. It is Schmidt's position as to its motion that even if Cicione were able to prove all of the contested facts, Schmidt would nevertheless be entitled to summary judgment. For the purpose of this discussion, we shall proceed on the assumption that Cicione will be able to produce evidence supporting all of its allegations. Therefore, in the recitation of facts as hereinafter set forth, whenever the parties are in disagreement the facts have been resolved and all inferences drawn in Cicione's favor. It is on this basis that we summarize the facts in this case as follows:

During the period of time in which Cicione was a Schmidt "ID" distributor, 1959–1973, Cicione alleges that Schmidt continually made certain demands upon Cicione. They included demands that Cicione increase inventory, hire additional personnel, make substantial investments in plant and equipment, and take on bookkeeping systems which were not suited to Cicione's business. In addition to these requirements, Schmidt allegedly fixed both the price that it charged Cicione, as well as the resale price at which Cicione could sell to distributor and tavern accounts. Schmidt constantly threatened to terminate Cicione if its dictates were not followed. In March of 1971 Schmidt allocated territories among the Philadelphia distributors and in July of 1972 cut 15% of Cicione's territory for its alleged failure to comply with Schmidt's dictates.

Pflaumer, who was also a Schmidt "ID" distributor, made several attempts to purchase Cicione's business and the

---

3. Schmidt claims that Cicione merely sold its business and was not terminated, but has agreed to so characterize the arrangement for purposes of simplicity in the pre-trial order. We have referred to it as a termination for the purpose of this discussion.

businesses of other "ID" distributors in Philadelphia. Cicione avers that Schmidt fostered Pflaumer's acquisitions and aided and abetted its growth in order to implement Schmidt's marketing plan of establishing and maintaining Pflaumer as its largest distributor. Even though Cicione's sales performance allegedly was as good as, if not better than, other "ID" distributors, as evidenced by an award that it received from Schmidt for good performance, Schmidt terminated Cicione's franchise in 1973. Contemporaneously with the termination, Schmidt arranged for Pflaumer to purchase Cicione's business allegedly as part of Schmidt's overall plan to make Pflaumer its sole distributor in Philadelphia. Cicione claims that Schmidt intended to eliminate not only the "ID" distributors but also the smaller "Mom and Pop" type of distributors; and planned to charge Pflaumer a higher price than it had been charging other distributors, while keeping distribution costs to a minimum. Cicione alleges that this was possible because Pflaumer was able to operate on a small margin of profit.

Schmidt never treated Cicione as an independent business, avers Cicione. Cicione claims it was an economic captive of Schmidt's scheme to establish and maintain prices, and to monopolize distribution of Schmidt's beer in the City of Philadelphia in one distributor. Subsequent to its termination, Cicione instituted this suit in August, 1973. The first amended complaint [4] alleges the following violations in two counts: [5]

(a) Count I alleges violations of Section I of the Sherman Act, charging that, with respect to Cicione, Schmidt illegally dictated business practices, maintained territorial restrictions and imposed resale prices;

(b) Count III charges violations of Sections I and II of the Sherman Act, alleging that Schmidt's termination of Cicione's dealership constituted a concerted refusal to deal with plaintiff; that Schmidt and Pflaumer conspired to force Cicione to surrender his distributorship; and that their conduct was an unlawful attempt to monopolize, or a conspiracy to monopolize, the distribution of Schmidt's beer and the distribution of all beer in Philadelphia.

■ In response to Schmidt's motion for summary judgment, Cicione argues that even though pre-trial discovery has been substantially completed, material issues of fact remain. In a motion for summary judgment, all doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *First Pa. B. & T. Co. v. United States Life Ins. Co.*, 421 F.2d 959, 962 (3d Cir. 1969), *reh. denied* December 10, 1969. As stated in *Moore's Federal Practice*, ¶ 56.15[3] at 2335–36:

> The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to judgment as a matter of law.

> The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. (Footnotes omitted).

■ Although a summary judgment procedure should be used sparingly in complex antitrust cases where motive and intent play leading roles, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), under Rule 56, once a properly supported summary judgment motion is made, an adverse party may not

---

4. The charges of Cicione's complaint were totally restated in its amended complaint filed September 11, 1973.

5. Count II of the amended complaint, which alleged violations of the Robinson Patman Act, 15 U.S.C. § 13, has been withdrawn by plaintiff.

rest upon the mere allegations of his pleading. His response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if otherwise appropriate, shall be entered against him. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1966); *Chapman v. Rudd Paint & Varnish Company,* 409 F.2d 635, 643–4 (9th Cir. 1969). It is not necessary, however, for the Court to consider whether genuine issues of fact exist for trial because, as we have heretofore pointed out, the Court has accepted Cicione's version of all the factual issues for the purpose of this summary judgment motion.

## I. TERMINATION OF DISTRIBUTORSHIP.

### A. The Section I Claim—Restraint of Trade.

█ In its complaint, Cicione makes sweeping allegations which boil down to the contention that the termination of its distributorship violates both Section I and Section II of the Sherman Act. Cicione appears to predicate its Section I claim on the theory enunciated by the Supreme Court in *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), that under certain circumstances, refusal of a manufacturer to deal with a distributor can constitute a "combination" in restraint of trade within the purview of the Sherman Act,[6, 7] *see also, United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 722, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *Federal Trade Commission v. Beech-Nut Packing Co.,* 257 U.S.

441, 42 S.Ct. 150, 66 L.Ed. 307 (1922). However, in its complaint and pre-trial order, the only allegation made to support its contention that the termination violates Section I of the Sherman Act is the claim that Schmidt desired to make Pflaumer its sole distributor. Furthermore, a review of the pleadings, depositions, affidavits, answers to interrogatories and pre-trial order reveals no factual basis which would bring this case within the *Parke Davis* exception or any other exception to the well-settled law that the termination of a distributorship, without more, is not an antitrust violation.

The contention that a manufacturer's cancellation of a dealership relationship constitutes an antitrust violation is not a new one. In numerous cases in this Circuit and elsewhere, the following principle has been repeatedly affirmed: "A single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and . . . such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A." *Ark Dental Supply Company v. Cavitron Corporation,* 461 F.2d 1093, 1094 (3d Cir. 1972); *Ricchetti v. Meister Brau, Inc.,* 431 F.2d 1211, 1214 (9th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 78 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, *reh. denied.* 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415; *Mogul v. Levin,* C.A. 71–2195 (E.D.Pa.1975); *Marder v. Conwed Corporation,* 378 F. Supp. 109, 111 (E.D.Pa.1974); *Peerless*

---

6. *See* memorandum of Cicione in opposition to Schmidt's motion for summary judgment, pg. 15.

7. " . . . Although Parke Davis' originally announced wholesalers' policy would not under *Colgate* (*United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992) have violated the Sherman Act if its action thereunder was the simple refusal without more to

deal with wholesalers who did not observe the wholesalers' Net Price Selling Schedule, *that entire policy was tainted with the 'vice of . . . illegality,' . . . when Parke Davis used it as the vehicle to gain the wholesalers' participation in the program to effectuate the retailers' adherence to the suggested retail prices."* 362 U.S. at 45–6, 80 S.Ct. at 512. (Emphasis added).

*Dental Supply Co., Inc. v. Weber Dental Manufacturing Company*, 283 F.Supp. 288, 290 (E.D.Pa.1968). *See also, Champion Oil Service v. Sinclair Refining Co.*, 502 F.2d 709 (6th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1131, 43 L.Ed.2d 401 (1975); *Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637 (10th Cir. 1973), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973); *Alpha Distributing Co. of Cal., Inc. v. Jack Daniel Distillery*, 454 F.2d 442 (9th Cir. 1972), *cert. denied*, 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1947); *Beckman v. Walter Kidde & Co.*, 451 F.2d 593 (2d Cir. 1971), *affirming* 316 F.Supp. 1321 (E.D.N.Y.1970), *cert. denied*, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972); *Beverage Distributors, Inc. v. Olympia Brewing Co.*, 440 F.2d 21 (9th Cir.), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); *Daily Press, Inc. v. United Press International*, 412 F.2d 126 (6th Cir.), *cert. denied*, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Scanlan v. Anheuser-Busch, Inc.*, 388 F.2d 918, 921 (9th Cir. 1968); *Timken Roller Bearing Co. v. Federal Trade Commission*, 299 F.2d 839 (6th Cir. 1962), *cert. denied*, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962); *Varney v. Coleman Company, Inc.*, 385 F.Supp. 1337 (D.N.H.1974); *Bay City-Abrahams Bros., Inc., v. Estee Lauder Co.*, 375 F.Supp. 1206 (S.D.N.Y.1974).

As our learned colleague, Judge Luongo, pointed out in *Marder, supra*, 378 F.Supp. at 111, the reason that a manufacturer's decision to replace his distributor or representative is not violative of the antitrust law is explained in *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283, 286–87 (6th Cir. 1963), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963):

> A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly. The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damages alone does not constitute liability under the Act. [Footnotes deleted].

Section I of the Sherman Act prohibits contracts or combinations which restrain trade. Therefore, the termination of a distributor violates Section I only if, in fact, it constitutes a restraint of trade or was motivated by an anti-competitive intent. *Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir. 1972).[8] In this case, even if there had been an agreement between Schmidt and Pflaumer to terminate Cicione and replace it with Pflaumer, Cicione could not sustain its antitrust claim absent proof of Schmidt's anti-competitive purpose or a resulting restraint of trade.

Although Cicione has failed to pinpoint the specific evidence on which it relies as a basis for the alleged Sherman I violation, we will give Cicione the benefit of all doubts by discussing all of the evidence from which it might be in-

---

8. The facts in *Bushie* are virtually identical to those before us. In *Bushie*, the plaintiff, formerly a distributor for defendant manufacturer, brought suit under Sections I and II of the Sherman Act when the defendant canceled his distributorship contract and retained a new distributor. The Ninth Circuit affirmed summary judgment in defendant's favor. In finding that the plaintiff did not present a Section I claim, the court conceded that the agreement between the manufacturer and the new distributor would eliminate the plaintiff as a distributor, but the court held that this effect would not support a conclusion that the manufacturer's motive was anti-competitive. Hence, the court ruled that a manufacturer may discontinue dealing with a particular distributor for business reasons sufficient only to itself; any adverse effects upon the distributor are immaterial absent any arrangement restraining trade. 460 F.2d at 119–120. In regard to the Section II claim, the court held that unless the manufacturer uses the control over his own products to establish market dominance, the antitrust laws are not violated. *Id.* at 120–121.

ferred that Schmidt's actions restrained trade or were motivated by an anti-competitive intent.[9]

■ Cicione states that Pflaumer's takeover of its business reduced the number of distributors of Schmidt's beer in Philadelphia. In substance, this argument appears to be that Cicione's elimination from competition restrained trade in the market for Schmidt's beer. However, such argument is unavailing, for it is well recognized that a manufacturer may discontinue dealing with a particular distributor for business reasons which are sufficient to the manufacturer. [*See* our discussion of the monopolization claim, *infra.*]

> . . . . If he [a manufacturer] is engaged in a private business, he is free to . . . [sell] his product directly to the ultimate consumer or through one or more distributors or dealers, as he may deem most profitable to him. If he chooses the latter method, he may exercise his own independent discretion as to the parties with whom he will deal. This is a common law right which the antitrust laws have not destroyed. *Schwing Motor Company v. Hudson Sales Corporation*, 138 F.Supp. 899, 902–03 (D.Md.1956), aff'd per curiam, 239 F.2d 176 (4th Cir. 1956).

The resulting reduction in the number of Schmidt's distributors does not, standing alone, restrain trade nor decrease competition.

Nor does Cicione's claim that its performance was as good as, if not better than, other "ID" distributors [10] tend to show that Schmidt cancelled its dealership with an intent to restrain trade. "[T]he most [Cicione's] evidence suggests is that [Schmidt] may have been mistaken in judging the quality of plaintiff's performance." *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra,* 416 F.2d at 78. It does not mean that a finder of fact could draw from it the further inference that some "sinister anticompetitive intent" existed. *Id.; Bushie v. Stenocord Corporation, supra,* 460 F.2d at 120.

■ As was made clear by the Supreme Court in *First National Bank v. Cities Service, Inc., supra,* allegations of unreasonable restraint of trade must be supported by "significant probative evidence" in order to overcome a motion for summary judgment. Accepting Cicione's version of the facts as true, the Court finds that Cicione's allegations do not support a restraint of claim contention.

## I. TERMINATION OF DISTRIBUTORSHIP.

### B. *The Section II Claim—Monopolization.*

Section II of the Sherman Act prohibits all monopolies and every attempt or conspiracy to monopolize commerce. In this part of its complaint, Cicione repeats the allegations it made to support its Section I claim, charging that its termination was a violation of Section II insofar as it represented a "culmination of a course of conduct [between Schmidt and Pflaumer] designed to establish Pflaumer in a monopoly position as the sole distributor of Schmidt's beer in Philadelphia." (First Amended Complaint, pgs. 15–16). The basis for this assertion is Pflaumer's purchase of the businesses of other wholesalers, which reduced the total number of Schmidt

---

9. Although Cicione claims that Schmidt illegally dictated resale prices and maintained territorial restraints, it does not allege that the termination was in any way related to the price fixing or territorial limitations. Therefore, there was no "causal nexus" between these alleged violations and the cancellation. *See, Hutchinson v. American Oil Company,* 221 F.Supp. 728 (E.D.Pa.1963). Furthermore, as discussed hereinafter, we find the allegations of price fixing and territorial restraints to be legally deficient.

10. *See,* pre-trial order, III–B(1), plaintiff's contested facts; affidavit of Joseph A. Cicione entered in support of Cicione's answer to Schmidt's motion for summary judgment, pg. 5, paragraph 23.

distributors in Philadelphia to three (including Pflaumer). Schmidt wished to establish Pflaumer as its only distributor in Philadelphia, reasons Cicione, so that it could charge Pflaumer a higher price than it was charging other "ID" distributors. Cicione claims that this was possible because Pflaumer was able to remain profitable while operating on a small margin of profit. In the Section II claim, Cicione also alleges that Schmidt and Pflaumer were conspiring to obtain a monopoly for Pflaumer in the distribution of all beer in Philadelphia.

■ The first contention (that Schmidt and Pflaumer conspired to give Pflaumer a monopoly in the sale of Schmidt's beer), is untenable as a matter of law. Every manufacturer has a natural monopoly in the sale and distribution of his own product, especially when the products are sold under a trademark such as Schmidt uses in marketing its beer. *United States v. E. I. DuPont de Nemours & Co.*, 351 U.S. 377, 393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1344 (9th Cir. 1970); *A-1 Business Machine Company v. Underwood Corporation*, 216 F.Supp. 36, 37 (E.D. Pa.1963). Unless the manufacturer makes use of his natural monopoly to gain control of the relevant market in which his product competes, there is no antitrust violation. *Bushie v. Stenocord Corp., supra*, 460 .F.2d at 120 (1972). There is no evidence in this case that suggests that Schmidt had market dominance, i. e., "some power to control price and to exclude competition," *United States v. Loew's, Incorporated*, 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962). The stipulated facts, which show that Schmidt's percentage of the relevant market dropped from 28% in 1967 to 20% in 1975, are not sufficient to support that conclusion.

■ Even assuming, therefore, that Cicione could prove a conspiracy between Schmidt and Pflaumer, Schmidt could not have violated Section II by conspiring with Pflaumer to give Pflaumer a monopoly position with respect to the distribution of Schmidt's beer. Because Schmidt possessed a natural monopoly with respect to its beer, it could choose to market it in any way that it desired.

"  .  .  .  . Unless the manufacturer dominates the market, he has a right to give a dealer an actual monopoly, let alone a 'virtual' monopoly, in the sale of his particular make or brand in a particular territory." *Schwing Motor Company v. Hudson Sales Corporation, supra*, 138 F.Supp. at 906.

Cicione's second monopolization charge, which alleges a conspiracy between Schmidt and Pflaumer to obtain a monopoly position in the distribution of all kinds of beer for Pflaumer, is likewise deficient. Although the basis for this allegation is vague and illusive it appears that Cicione's claim in this regard is based upon its allegation that Pflaumer would use its alleged monopoly position as Schmidt's sole distributor to obtain a monopoly in the distribution of all beer and thus force retailers eventually to buy only Schmidt's beer.

■ While the completed offense of monopolization under Section II of the Sherman Act demands only a general intent to do the act, a specific intent to destroy competition or build a monopoly is essential to guilt for the conspiracy to monopolize charged herein: *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1956); *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1903). In addition, proof of a dangerous probability of success of the monopoly in a relevant market is essential to prove either an attempt or a conspiracy to monop-

olize;[11] *American Tobacco Co. v. United States*, 328 U.S. 781, 784–786, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Rea v. Ford Motor Company*, 497 F.2d 577, 590, n. 28 (3d Cir. 1974); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 (5th Cir. 1969); *Bernard Food Industries, Inc. v. Dietene Co.*, 415 F.2d 1279, 1284 (7th Cir. 1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 971 (9th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748.

This Court has searched the record in order to find evidence bearing on these two requisites—specific intent to monopolize and a dangerous probability of success—and can find no reference to any evidence which would support either of them. The only evidence on which Cicione seems to rely is the list of Schmidt's distributors who sold their businesses to Pflaumer. However, it is impossible for this Court to ascertain how this would support an allegation of an intent to monopolize the entire Philadelphia beer market. Pflaumer may well become the only distributor for Schmidt's beer in Philadelphia. Yet an intention to reach that goal is a far cry from a specific intent to monopolize the sale of all kinds of beer in Philadelphia. In order for such a monopolization scheme to succeed, other manufacturers who sell beer in Philadelphia, such as Budweiser, Schaefer, Miller, Schlitz, Piels, Ortlieb, Rheingold and Ballantine, would have to drop their current distributors and give those franchises to Pflaumer. As far as we can ascertain from the record in this case, there is no evidence that would even tend to suggest that this could occur. Not only is the record devoid of evidence to support a dangerous probability that monopoly would occur, but it does not show even a faint possibility of success. Based on the evidence that Cicione plans to produce at trial, a jury could not find either a specific intent or a dangerous probability of success. Therefore, even when Cicione's version of the disputed facts surrounding its termination are given credence, no monopoly violation is made out.

In summary, none of the antitrust allegations arising out of the termination establishes a claim cognizable under the Sherman Act. Whether viewed as a restraint of trade under Sherman I or an attempt to monopolize under Sherman II, there is no evidence alleged by Cicione which excepts this case from the well established law that the termination of a distributorship, without more, is not an antitrust violation.[12] The admonition of the Fifth Circuit in *Burdett Sound, Inc. v. Altec Corporation*, 515 F.2d 1245 (5th Cir. 1975), is particularly apposite here.

> Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business.

11. Although there are cases which hold that a dangerous probability of monopolization is not an essential element of proof, *see, Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir. 1964), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961), we think the better rule is to require such proof.

12. Cicione further contends, with respect to its cancellation, that *Mariniello v. Shell Oil Company*, 511 F.2d 853 (3d Cir. 1975) and *Shell Oil Co. v. Mariniello*, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 290, 94 S.Ct. 1421, 39 L.Ed.2d 475, prevent Schmidt from terminating Cicione without good cause. This Court has previously rejected this rationale, *North Penn Oil & Tire Co. v. Phillips Petroleum Co.*, 371 F.Supp. 676 (E.D.Pa.1974), by pointing out that *Shell Oil Co. v. Mariniello* interpreted the public policy underlying the recently enacted New Jersey Franchise Practices Act, which is not the law of Pennsylvania. The decision of the Third Circuit in *Mariniello v. Shell Oil Co.* does not affect our holding in *North Penn.*

## II. COERCIVE TACTICS.

In addition to the alleged Sherman Act violations arising out of the termination of Cicione's distributorship, which we have already ruled upon, Cicione makes three additional claims of Sherman Act violations not connected with its termination. The first of these additional claims is the alleged "coercive tactics" which Schmidt pursued with respect to Cicione. Cicione charges that Schmidt forced it to make substantial investments in plant and equipment for the sole benefit of Schmidt; imposed a quota system for sales; instituted inventory requirements; changed Cicione's territory; and dictated advertising and personnel assignments.[13] However, even accepting these charges as true, we find no law nor has the plaintiff referred us to any law which makes such practices violations of the Sherman Act.

## III. TERRITORIAL RESTRICTIONS.

The second of Cicione's additional Sherman Act claims not connected with its termination is its contention that Schmidt's allocation and implementation of territorial restrictions violates Section I of the Sherman Act. Although both parties agree that pursuant to Pennsylvania law, Schmidt, in 1971, gave each of the six wholesalers a "territorial letter" defining an exclusive territory, Cicione claims that this was illegal under the teachings of *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). There the Supreme Court said: ". . . where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results." 388 U.S. at 379, 87 S.Ct. at 1865

(emphasis in original). Schmidt, however, argues that since the territorial arrangements were undertaken pursuant to the Pennsylvania Liquor Code, they were insulated from the antitrust statutes by virtue of the Twenty-First Amendment.

Section 2 of the Twenty-first Amendment states: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." It gives the states broad regulatory power over liquor use, distribution, or consumption within its borders. *See, Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966); *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). However, it is clear that the Sherman Act is applicable whenever its enforcement would not defeat the state's liquor policy. *United States v. Frankfort Distillers*, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945). "Such a policy may be expressed either formally by legislation or by implied permission." 324 U.S. at 301, 65 S.Ct. at 666. The problem, then, in cases like this is to determine whether the policy of the state sanctions the arrangement claimed to violate the Sherman Act. *See United States v. Erie County Malt Distributors Association*, 264 F.2d 731 (3d Cir. 1959); *Fairfield County Beverage Distributors, Inc. v. Narragansett Brewing Company*, 378 F.Supp. 376 (D.Conn. 1974); *J.W.T. Inc. v. Kobrand Corp.*, CCH Trade Cases, 1973–2 ¶ 74,726 (N. D.Ill.1973). At the very least, the Pennsylvania Liquor Code [14] must be con-

---

13. *See* affidavit of Salvatore Cicione, entered in support of Cicione's answer to Schmidt's motion for summary judgment, pg. 2, paragraphs 7 and 9; pg. 3, paragraph 14.

14. The Pennsylvania Liquor Code, 47 P.S. § 4–431(b), provides in part:
   *When a Pennsylvania manufacturer of malt or brewed beverages licensed under this article names or constitutes a distributor or importing distributor as the primary or original supplier of his product, he shall also designate the specific geographical area for which the said distributor or importing distributor is given distributing rights*, and such distributor or importing distributor shall not sell or deliver the products of

sidered "implied permission" for Schmidt's action in making territorial assignments to wholesalers. As a Pennsylvania manufacturer of brewed beverages who named its wholesalers as "primary or original supplier[s]" of its beer,[15] the Pennsylvania Liquor Code required Schmidt to designate the specific geographical area within which these "ID" distributors could resell beer. Because Schmidt's territorial restrictions were issued pursuant to the Pennsylvania Liquor Code, its actions are immune from the prohibitions of the Sherman Act.[16]

█ However, Cicione's allegations go further than a claim that the allocation of territories was, in itself, illegal. Cicione also avers that the territorial designations were illegal insofar as Schmidt misused them. In this connection it complains that Schmidt's reduction of Cicione's territory in July of 1972 was undertaken to punish Cicione for its failure to adhere to Schmidt's unlawful demands. However, inasmuch as we have found that the business dictates were not illegal and since we hereafter find that its resale price policy was not illegal, there is no basis for the allegation that the territorial allocations were misused.

## IV. PRICE FIXING.

█ The third claim of Cicione which does not arise from its termina-

tion is its allegation that Schmidt violated Section I of the Sherman Act by dictating the price at which Cicione could resell the beer to distributor and tavern accounts. Accepting this allegation as true for the purposes of this motion, the question remains whether the resale maintenance was permissible under the Pennsylvania Fair Trade Law. This law, 73 P.S. § 7, provides, in part, as follows:

> No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, or the vending equipment from which said commodity is sold to the consumer bears the trademark, brand, or the name of the producer or owner of such commodity, and which is in fair and open competition with commodities of the same general class produced by others, shall be deemed in violation of any law of the State of Pennsylvania by reason of any of the following provisions which may be contained in such contract:
>
> (a) That the buyer will not resell such commodity, except at the price stipulated by the vendor.

Thus, under Pennsylvania law, the vendor (Schmidt) and the buyer (Cicione) could agree to a resale price "stipulated" by the vendor (Schmidt).[17] Such contracts are valid and do not violate the Pennsylvania Constitution. *Olin Ma-*

---

such manufacturer to any person issued a license under the provisions of this act whose licensed premises are not located within the geographical area for which distributing rights have been given to the distributor and importing distributor by the said manufacturer: Provided, That the importing distributor holding such distributing rights for such product shall not sell or deliver the same to another importing distributor without first having entered into a written argeement with the said secondary importing distributor setting forth the terms and conditions under which such products are to be resold within the territory granted to the primary importing distributor by the manufacturer. Nothing herein contained shall be construed to prevent any manufacturer from authorizing the importing distributor holding the distributing rights for a designated geographical area from selling the

products of such manufacturer to another importing distributor also holding distributing rights from the same manufacturer for another geographical area, providing such authority be contained in writing and a copy thereof be given to each of the importing distributors so affected. (Emphasis added).

15. *See* stipulated facts.

16. Schmidt urges as an additional basis in support of its motion for summary judgment, that Cicione's active participation in the territorial restrictions bars its claim. However, since we have ruled that the territorial restraints entered into pursuant to the Pennsylvania Liquor Code were valid under the Twenty-First Amendment, it is not necessary to discuss the merits of this argument.

17. It is unclear whether Cicione has charged Schmidt with fixing maximum resale prices

*thieson Chemical Corporation v. Cohen,* 234 F.Supp. 80 (E.D.Pa.1964). They are likewise, under the Federal McGuire Act, 15 U.S.C. § 45(a)(3), an exception to, and do not violate, the Sherman Act. However, resale price-fixing which is not sanctioned by a state resale price statute, is a per se violation of Section I of the Sherman Act. *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *Kiefer-Stewart Co. v. Joseph F. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Similarly, a manfacturer who goes beyond entering into agreements with his distributors and enters into agreements with other manufacturers to utilize fair trade agreements to fix prices violates the Sherman Act. *United States v. Frankfort Distillers, supra.*

Under a fair trade law, a seller may condition his sale on adherence to the stipulated resale price, and need not sell to those who do not agree. *Vornado, Inc. v. Corning Glass Works,* 255 F.Supp. 216, 227 (D.N.J.1966), *aff'd,* 388 F.2d 117 (3d Cir. 1968); *Catalina, Inc. v. Alexander's Department Store, Inc.,* 1966 Trade Cases, ¶ 71,796 (S.D. N.Y.1966). *See also, United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Therefore, Cicione had the option of adhering to Schmidt's resale price policy or ceasing to 'purchase from Schmidt. By adhering to Schmidt's resale price policy, Cicione evinced its agreement [18] with Schmidt pursuant to Pennsylvania's Fair Trade Law.[19]

Furthermore, Cicione stated in its deposition that its prices would have been the same without Schmidt's

---

or with dictating the exact price at which Cicione was required to sell. However, even if Schmidt's conduct is viewed as the fixing of maximum prices, it would still fall within the meaning of the word "stipulated". *See Schwegmann Brothers v. Calvert Distiller Corp.,* 341 U.S. 384, 388, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); *Graham v. Triangle Publications, Inc.,* 233 F.Supp. 825, 830–831 (E.D.Pa.1964), *aff'd. per curiam,* 344 F.2d 775 (3d Cir. 1965); *Bowen v. New York News, Inc.,* 366 F.Supp. 651 (S.D.N.Y.1973); *Mead Johnson & Co. v. West Chester Discount Health and Vitamin Center, Inc.,* 212 F.Supp. 310 (E.D.Pa.1962).

18. *See United States v. Revlon, Inc.,* 1975 Trade Cases, ¶ 60,202 (S.D.N.Y.1975), p. 65, 727, where the Court said:

As to retailers, sold by Revlon direct, Revlon did have a definite practice and policy to require resale price maintenance in those states with fair trade laws. *Revlon insisted on fair trade agreements, oral or written* (but nearly always written, in one form or another) before it would sell to retailers in those states. *Such a policy is not unlawful under the Sherman Act.* (Emphasis added).

19. Cicione appears to place reliance upon two recent decisions, *Copper Liquor, Inc. v. Adolf Coors Co.,* 506 F.2d 934 (5th Cir. 1975) and *Adolf Coors Company v. F.T.C.,* 497 F.2d 1178 (10th Cir. 1974). In both cases, the same factual background led to similar Sherman Act charges being brought against Adolf

Coors Company ("Coors"), a beer manufacturer. However, Cicione does not specify precisely how these two decisions are applicable to the case at bar. Although the *Coors* cases and the instant case both involve Sherman Act charges that were brought against beer manufacturers, we find that they are readily distinguishable and do not support any of Cicione's allegations. In *Copper,* a retail liquor store owner whose supply of "Coors" was cut off by a Coors distributor claimed that Coors conspired with distributors in its eleven-state marketing area to fix the retail price of "Coors". In retaliation for plaintiff's selling below Coors suggested prices, Coors allegedly caused its distributor to discontinue supplying "Coors" to the plaintiff. The plaintiff also alleged that Coors conspired with its distributors to create and enforce exclusive territories, thereby making it impossible for plaintiff to obtain a supply of Coors beer from another distributor. With respect to the issues of price fixing and territorial restraints, Coors did not assert that any state law insulated it from the prohibitions of the Sherman Act. Contrariwise, the basis for Schmidt's motion for summary judgment on the price fixing charge is its compliance with the Pennsylvania Fair Trade Act, together with Cicione's testimony that it would have lost business if it had tried to charge a higher price for Schmidt's beer, (*see* n. 20, *supra*), and on the territorial restraints charge, the Pennsylvania Liquor Code, which requires territorial restrictions.

**656**

alleged price-fixing.[20] A plaintiff seeking to recover treble damages under the Clayton Act must prove an injury to his business resulting from the defendant's violation, and some indication of the amount of damage. *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir. 1974), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260; *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 901–02 (5th Cir. 1973), *cert. denied*, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150. In light of Cicione's statement that its prices would have been the same even• if Scmidt had not dictated its resale prices, there appears to be no basis for such a damage claim.[21]

Accordingly, for the reasons hereinbefore stated, the motion of defendant Schmidt for summary judgment is granted.

20. *See* deposition of Joseph Cicione, pgs. 295–297; pg. 348.

Q. I recognize your testimony that Mr. Arenschield is supposed to have told you that these were prices you must sell at, but let's leave that aside. Suppose he had not said that and assume that—as I believe the case to be—you were entitled to sell and free to sell at any price you wanted. Would you have charged more than those prices on the schedule there?

A. I don't think I would, in view of the fact that if I did, I would be selling higher than Piel's and Schaefer and I would lose some of the business.

Q. You couldn't get away with that, could you?

A. No, I couldn't get away with it.

Q. Is that true, by and large, of all the resale prices you sold at through the years? You have to meet your competition?

A. With the best we can compete with them, we try, to, yes.

Q. So that you could not have increased your prices if you wanted to, in view of the competition from Piel's and Ballantine and Schaefer?

A. Under the structure, under this setup, I don't see where we could.

Q. I mean just in the free and open competition of the marketplace. Didn't you have to meet the competition of those other brands?

. . . . .

Q. So that under any circumstances the prices that you charged throughout this period

that we are talking about—1969 through 1974 —were fixed by competition, weren't they?

A. To a certain extent. We tried to—

Q. (Interposing) Could you have charged more than your competition?

A. Questionable. I don't know if I could and get away with it. I could have, but if I would have got away with it, I don't know.

Q. You might have lost business?

A. I might have lost some business.

. . . . .

Q. Wouldn't it be true that if you tried to charge more for Schmidt's that you would have then lost business of Schmidt's beer.

A. Yes, it would be true.

21. *See Kestenbaum v. Falstaff Brewing Corporation*, 514 F.2d 690, 694 (5th Cir. 1975), where, in a similar case, the Court said: "Kestenbaum submits that although it is true that he would have stayed competitive with popular brands even without a directive from Falstaff, when Falstaff's requirement that he do so was coupled with its taking of one-half of all additional revenue from his price increases on retail accounts, a situation was created in which he was not free to realize the percentage of profit that could have been attained absent this requirement. . . . *A prerequisite to Kestenbaum's recovery on this issue was a showing that the price ceiling on sales by him, disregarding the price charged to him, caused injury. Not only did he fail to prove this, he established that the wholesale price which Falstaff allegedly fixed was a proper price.*