154 N.J. Super. 538 (1977)
382 A.2d 45
EXXON CORPORATION, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
PAUL G. WAGNER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1977.
Decided December 16, 1977.
*540 Before Judges LYNCH, BISCHOFF and KOLE.
Mr. Roger A. Clapp argued the cause for appellant.
Mr. William L. Dill, Jr. argued the cause for respondent (Messrs. Stryker, Tams & Dill, attorneys; Mr. Thomas M. Roche on the brief).
The opinion of the court was delivered by KOLE, J.A.D.
Defendant (Wagner) appeals from a grant of summary judgment in favor of plaintiff (Exxon) on counts 3 and 4 of his amended counterclaim.
Both counts alleged violations of the state Anti-Trust Act. Count 3 charged that Exxon, by and through its agents or employees, caused trade to be diverted away from Wagner and to other businesses owned by and operated for the benefit of Exxon, contrary to N.J.S.A. 56:9-3. Count 4 alleged that Exxon, by and through its agents or employees, attempted to monopolize and has monopolized sales under its trademarks to the exclusion of independent dealers, contrary to N.J.S.A. 56:9-4.
The trial judge entered the judgment after considering the pleadings, affidavits and Wagner's deposition testimony.
We have carefully reviewed the record and have applied the same standard in determining whether the summary judgment should have been granted as was applied by the trial judge. R. 4:46-2; Judson v. Peoples Bank & Trust *541 Co. of Westfield, 17 N.J. 67 (1954). In reaching our determination we have considered that where subjective elements, such as intent or motive, are involved, summary judgment is to be granted with caution. Judson, at 76; Allen v. Evesham Tp. Planning Bd., 137 N.J. Super. 359 (App. Div. 1975). So viewed, we have concluded that there was no genuine issue of material fact raised and that Exxon was entitled to judgment on both counts as a matter of law.
What follows are the facts that are undisputed.
Exxon was a lessee of the premises at 47 Shrewsbury Avenue[1], Red Bank, New Jersey, at which an Exxon service station was operated. In 1968 its 15-year lease had expired but it had the option thereunder to renew the lease for ten additional one-year periods. Wagner entered into his first written sublease with Exxon for a service station dealership for these premises on January 31, 1969. He operated under the name "Commuter's Esso." He apparently knew that he was operating under the one-year option periods of Exxon's original lease, but even if he was not aware of this fact, he knew that the life of his sublease was limited to the period of Exxon's rights under its lease. In any event, that sublease commenced on February 1, 1969 and was to terminate February 1, 1970. Wagner borrowed $11,000 from Exxon for his initial inventory. A second and third sublease were executed covering the one-year periods from February 1, 1970 to February 1, 1972. On February 1, 1972 Wagner became a month-to-month tenant. Exxon endeavored to terminate the tenancy as of April 1, 1972. After litigation instituted by Wagner, which was dismissed without prejudice, the monthly tenancy was continued.
In late January 1973 Wagner commenced negotiations with Getty Oil Company for the operation of a Getty service station at 93 Shrewsbury, about 1 1/2 blocks from his Exxon station at 47 Shrewsbury. He acquired title to the 93 Shrewsbury *542 property on April 1, 1973 after he failed in his efforts to purchase the Exxon leased property at 47 Shrewsbury and bring a Getty station to that location. Exxon would not respond to his request to sell him its right to purchase the leased premises. On March 28, 1973 Wagner notified Exxon that he would vacate its premises on April 30, 1973. For the month of April 1973 Wagner was operating two gasoline service stations, Getty and Exxon. Up until the time Wagner left the Exxon station he was supplied by Exxon with all of the products he needed.
Wagner claimed that the verbal agreement between the Exxon representative and him at the outset of his sublease was that the business at 47 Shrewsbury would be his until he decided that he did not want it and that he would be "the last dealer at that location." He stated that he lost substantial sums of money because he was forced to move the location of his station. The station at 47 Shrewsbury had 80 parking spots which he was able to rent to commuters at a monthly rate, while the station at 93 Shrewsbury (Getty) only had 40 parking spaces. The commuters would buy gas and have repairs made. The termination of his Exxon station, he stated, diverted his clientele to other Exxon stations within the vicinity of 47 Shrewsbury.
There are 13 service stations in Red Bank. These represent seven different oil companies, including Exxon. There is also another service station in the municipality of Shrewsbury, at the border of Red Bank.
In 1969 Exxon marketed its products through four outlets, including Wagner's Commuter's Esso, in Red Bank. One outlet was managed by Exxon itself, while the others were independent dealerships. During the time Wagner operated Commuter's Esso, Exxon added a new independent dealership and a new company-owned and managed station.[2] Both *543 were near Wagner's Commuter's Esso. We accept Wagner's allegation that there was a percentage increase in Company-managed Exxon stations in Red Bank before and after his Esso operation was terminated  from 25% (one out of four) to 40% (two out of five), even though the actual number of Exxon stations had actually increased from four to five.
The company-managed stations and other dealers were selling at lower prices than Wagner, since they were getting temporary price reductions from Exxon over a matter of months, while Wagner only got two such temporary reductions. These reductions generally assisted the stations in meeting the lower prices of a competitor. Although the Commuter's Esso Station was deteriorating and Wagner repeatedly requested Exxon to make repairs, it refused to honor the request.
The trial judge determined that there was no contract or combination in restraint of trade under N.J.S.A. 56:9-3 merely because the remaining Exxon dealers may have acquired many of Wagner's customers after he left 47 Shrewsbury, nor could any reasonable inference be made that Exxon's motive in eliminating the operation at the location was to restrict trade or, in violation of N.J.S.A. 56:9-4(a), to monopolize or attempt to monopolize the relevant market. In the words of the trial judge, it "just isn't there, except to the extent Exxon had a trade market, and, within [that] market, can make a judgment in its distribution." He stated that although Exxon was powerful in the industry, it was not dominant, and that it had done nothing to restrict competition.
We are satisfied that the pleadings, affidavits and depositions, and the reasonable inferences therefrom, viewed most favorably to Wagner, plainly support the judge's conclusions as a matter of law.
*544 Wagner argues that, although the state Anti-Trust Act provides that it shall be construed "in harmony with ruling judicial interpretations of comparable Federal antitrust statutes," N.J.S.A. 56:9-18, the court need not "slavishly" follow the federal cases. Whether or not this contention is correct, we have concluded that in this case we should be guided by judicial precedent in the federal sphere. See Kugler v. Koscot Interplanetary, Inc., 120 N.J. Super. 216, 238 (Ch. Div. 1972).
The third count of Wagner's amended counterclaim charges a violation of N.J.S.A. 56:9-3, which is similar to § 1 of the Sherman Anti-Trust Act (the Sherman Act), 15 U.S.C.A. § 1. N.J.S.A. 56:9-3 makes unlawful every "contract, combination * * * or conspiracy in restraint of trade or commerce, in this State."
Wagner contends that by Exxon's "deliberate destruction" of his "competing" business, a unilateral offer was given to the independent dealers  "continue to do business as usual and you will gain the benefit of the [Wagner's] lost business". He also argues that Exxon unilaterally "eliminated [Wagner] as a competitor so that [his] business could be divided up and combined with the business" of Exxon at its retail outlets, as well as with the business of the surviving independents at their retail outlets. He finds support for these allegations in Exxon's refusal (1) to give him the price advantages given to other gas stations; (2) to help him repair his station at 47 Shrewsbury;[3] (3) to offer him a new location in his trade area when his tenancy at 47 Shrewsbury was eliminated, and (4) to accept his offer to purchase Exxon's rights in 47 Shrewsbury. He contends also that Exxon, acting as both wholesaler and retailer, had a short-range plan to eliminate and spread his business over the other remaining Exxon outlets, with a long-range plan of eliminating all independent dealers, thereby leaving Exxon *545 with exclusive control of the wholesale and retail market for its products.
Even if these charges are factually accurate, Exxon has not violated N.J.S.A. 56:9-3.
For there to be a contract, combination or conspiracy in restraint of trade in violation of N.J.S.A. 56:9-3, there must exist a plurality of actors, that is, two or more persons, and concerted action. There can be no such contract, combination or conspiracy by a corporation  here Exxon  with its own officers, agents or employees, who are performing their usual job of formulating and carrying out its managerial policy. Even if Wagner's tenancy or contract had been terminated improperly by Exxon, there was no violation of N.J.S.A. 56:9-3, as there was only unilateral action by Exxon. Such termination does not implicate that provision of the statute. No such contract or combination may be found merely because of the claimed unilateral offer by Exxon, acquiesced in by the other dealers in the area. Nor does the fact that those dealers will benefit from the termination of Wagner's Esso station by gaining his lost business suffice to support a conclusion that this anti-trust provision has been violated, particularly since there is no claim that Exxon acted or agreed with them to eliminate him. Bushie v. Stenocord Corp., 460 F.2d 116 (9 Cir.1972) (hereafter Bushie) Ace Beer Distributors, Inc., v. Kohn, Inc., 318 F. 2d 283 (6 Cir.1963), cert. den. 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), reh. den. 375 U.S. 982, 84 S.Ct. 479, 11 L.Ed.2d 428 (1964); Nelson Radio & Supply Co., Inc. v. Motorola, 200 F.2d 911, 914 (5 Cir. 1952), cert. den. 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356, (1953); V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc., 403 F. Supp. 643 (E.D. Pa. 1975) (hereafter Cicione); Mogul v. General Motors Corp., 391 F. Supp. 1305 (E.D. Pa. 1975), aff'd 527 F.2d 645 (3 Cir.1976) (hereafter Mogul); Quigley v. Exxon Company U.S.A., 376 F. Supp. 342 (M.D. Pa. 1974); Alexander v. Texas Co., 165 F. Supp. 53 (W.D. La. 1958).
*546 Additionally, there is a total lack of evidence in the record, or any reasonable inference therefrom, that Exxon had either a short-range or long-range plan of eliminating all independent dealers or any other anti-competitive invidious purpose when Wagner's Commuter's Esso operation was permitted to be terminated  e.g., that Exxon intended eventually to have exclusive control of the wholesale-retail market for its products in Red Bank or elsewhere. In short, not only has Wagner failed to show a contract or combination; there is also no basis for a reasonable conclusion that there is a genuine issue of material fact as to any relationship between the termination of his Esso station with an anti-competitive intent by Exxon in violation of N.J.S.A. 56:9-3. There is not a scintilla of evidence of any predatory practices engaged in by Exxon or any anti-competitive motive by it in connection with the termination of Wagner's station, which is essential for a violation of N.J.S.A. 56: 9-3, even if there exists a plurality of actors. See cases heretofore cited. Compare Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338 (3 Cir.1975). Indeed, the proof in the record is to the contrary.
Thus, it is clear from the evidence that there were more Exxon stations after Commuter's Esso went out of business than before Wagner began operating it. The fact that there was a percentage increase during that period in company-managed Exxon stations  25% (one out of four) to 40% (two out of five)  is of no practical or legal significance on the question of anti-competitive intent under the circumstances presented in this case. Again, while Wagner operated Commuter's Esso, Exxon supplied him with all of the products he wanted. The failure to repair the station or to cooperate with Wagner's desire to purchase the premises on which it was located did not constitute a breach of duty by Exxon, and in no wise is indicative of a motive to reduce or restrict competition in the statutory sense. Moreover, the only reasonable inference from the proofs is that the price favors afforded by Exxon to some of Wagner's competitors *547 in the area were simply temporary measures to permit them to maintain competition in order to meet price cutting by nearby stations selling other brands; and that Wagner actually needed only two such favors, which he received, while operating Commuter's Esso, to meet such competition. And it is plain that even after elimination of Commuter's Esso, there were many stations in the area serviced by various competitive petroleum companies. In fact, Wagner himself now operates a Getty station.
Wagner's claim as to an anti-competitive motive by Exxon in either the intra-brand or inter-brand market with respect to the termination of his station is predicated on speculation. It presents no genuine issue of material fact for trial.
Accordingly, summary judgment in Exxon's favor on count 3 of Wagner's amended counterclaim was properly granted.
The fourth count of the amended counterclaim charges a violation of N.J.S.A. 56:9-4(a), which is similar to § 2 of the Sherman Act, 15 U.S.C.A. § 2. N.J.S.A. 56:9-4(a) makes it "unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire * * * to monopolize trade * * * in any relevant market within this State."
Wagner claims that the relevant market area is the municipality of Red Bank, where his station was located. He argues that summary judgment cannot be granted on this count because the major issue for a trier of fact is "whether or not [Exxon] intended the use of [its] monopoly power as a means to eliminate [Wagner] as a competitor," in either the intra- or inter-brand markets. Wagner concedes that a trademark grants a manufacturer, such as Exxon, a monopoly to determine who can or cannot enter a retail market, but contends that the trademark does not give the manufacturer any right to exercise control within "the market" in ways otherwise violative of the anti-trust laws.
We assume, as Wagner claims, that the relevant market in this case, within the meaning of the anti-monopoly provisions *548 of N.J.S.A. 56:9-4(a), is the geographical area of the municipality of Red Bank.
On this record we hold that there are no genuine issues of material fact as to whether the termination of Wagner's station constituted a monopoly, or an attempt to monopolize, or the exercise of monopoly control, by Exxon in Red Bank of either Exxon products (intra-brand monopoly) or Exxon products and competitive products such as Sunoco, Cities Service, Gulf, Chevron and Texaco (inter-brand monopoly).[4] Apart from the fact that Wagner now competes as a Getty dealer in Red Bank  selling products that are admittedly competitive with those of Exxon , it is clear that the termination of Wagner as an Exxon dealer was not intended, nor could it have been intended, by Exxon as the use of a monopoly power to eliminate Wagner as a competitor in either the intra- or inter-brand markets. The summary judgment in favor of Exxon on the fourth count of the amended counterclaim, therefore, was proper.
The trademarked products of a single manufacturer, such as Exxon, might themselves constitute a relevant market for the purpose of finding a violation of N.J.S.A. 56:9-4(a)  the anti-monopoly provision  only "if they are * * * unique or so dominant in the market in which they compete that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed". Bushie, supra, 460 F.2d at 121.
There is a total lack of proof that Exxon had a dominant or monopolistic position in any of the relevant markets. Indeed, as we have stated, defendants own proofs show the existence in Red Bank alone of 13 stations selling six different brands (other than Exxon) of motor fuel. It is also plain from the record that Exxon products are not unique *549 and are interchangeable with those of other petroleum suppliers. Hence, they do not constitute a distinct product market; nor are they so dominant in the Red Bank geographical market in which they compete that the action by Exxon in terminating Wagner's station increased its control of its products or the sale thereof so as to virtually assure that competition by independent dealers or others in the market would be destroyed. We note that Wagner testified that about half of his Commuter's Esso customers followed him to his Getty station.
The factors demonstrating a lack of anti-competitive intent or motive by Exxon in terminating Wagner's station that we discussed in connection with count 3 likewise make it clear that such termination was not accompanied by an intent to monopolize or an attempt to monopolize the relevant market in which Exxon's products competed  either intra-brand or inter-brand. Similarly, the termination had no monopolistic impact on any such market. Exxon products were sold in only five out of 13 outlets in Red Bank  the market area upon which Wagner relies  and Exxon itself managed only two of those five Exxon stations. In no sense could such termination give Exxon any monopoly power in Red Bank with respect to the sale of its own products, or with respect to the entire motor fuel market therein. Nor, under the proofs or the reasonable inferences therefrom, can it be said that the single termination of Wagner's station created a dangerous probability of Exxon's actually obtaining a monopoly power over the sale of motor fuel, or even the sale of Exxon motor fuel, in Red Bank.
In addition to Bushie, supra, the following cases support our conclusion with respect to the summary judgment on the fourth count: Mullis v. Arco Petroleum Corp., 502 F.2d 290 (7 Cir.1974); Mogul, supra; Cicione, supra; Hiland Dairy, Inc. v. Kroger Co., 402 F.2d 968 (8 Cir.1968), cert. den. 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969); Nelligan v. Ford Motor Company, 161 F. Supp. 738 (W.D.S.C. 1958), aff'd 262 F.2d 556 (4 Cir.1959). See, generally, *550 Annotation, "What Constitutes `Attempt To Monopolize' Within Meaning of § 2 of Sherman Act (15 U.S.C.S. § 2)", 27 A.L.R. Fed. 762 (1976).
Wagner may have been hurt by the closing of Commuter's Esso and may have claims for relief against Exxon by reason thereof. But he has none predicated on any violation of the state Anti-Trust Act.
Affirmed.
NOTES
[1] "Shrewsbury Avenue" will hereafter be referred to merely as "Shrewsbury."
[2] As used hereafter an Exxon company-owned and managed station will be referred to as a "company-managed" station. It appears that the new company-managed station was later replaced by an independent dealer. But we assume, for the purposes of this opinion, that the station continued to be managed by Exxon.
[3] As the trial noted, Wagner failed to show any legal duty of Exxon to make such repairs.
[4] Wagner testified that there were 13 service stations in Red Bank and that, apart from Exxon, six different "oil company products are sold through these stations," naming those we have indicated, as well as an unbranded product.