**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1137-22

SAM MIKHAIL, on behalf of
QUALITY AUTO PAINTING
CENTER OF ROSELLE, INC.,
d/b/a PRESTIGE AUTO BODY,
BMR AUTOMOTIVE SERVICE,
INC., 821 COLLISION, LLC,
and ULTIMATE COLLISION
REPAIR, INC., on behalf of
themselves and others similarly
situated,

     Plaintiffs-Appellants,

v.

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY,

     Defendant-Respondent.

_____

Argued April 29, 2024 – Decided August 7, 2024

Before Judges Gilson, DeAlmeida, and Jacobs.

On appeal from the Superior Court of New Jersey, Law
Division, Union County, Docket No. L-1992-19.

Joshua S. Bauchner argued the cause for appellants (Mandelbaum Barrett PC, attorneys; Joshua S. Bauchner and Andrew Gimigliano, of counsel and on the briefs; Anthony J. D'Artiglio and Gabriel R. Blum, on the briefs).

Michael D. Celentano argued the cause for respondent (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Michael J. Marone, of counsel and on the brief; Michael D. Celentano, on the brief).

PER CURIAM

Plaintiffs are four automobile repair shops. They sued defendant New Jersey Manufacturers Insurance Company (defendant or NJM) alleging that NJM refused to negotiate repair rates with them in good faith and unlawfully steered customers away from their shops to other repair shops that accepted NJM's rates. Plaintiffs appeal from a November 18, 2022 order granting summary judgment to NJM and dismissing with prejudice plaintiffs' claims. A de novo review of the record establishes that plaintiffs failed to present evidence supporting all the elements necessary to prove their five alleged causes of action. Accordingly, we affirm.

I.

NJM has negotiated financial arrangements with a group of automobile repair shops under which the shops have agreed to charge fixed labor rates and comply with certain terms and conditions when they repair damaged vehicles

2

owned by persons that have NJM insurance policies. NJM calls its financial arrangements with licensed automobile repair shops and facilities the Premier Car Care Program (PCC Program). All shops that are part of NJM's PCC Program charge the same rates and use the same terms and conditions when making repairs on a vehicle owned by an NJM insured. The PCC Program is a direct repair program, and the program is allowed under the New Jersey Automobile Insurance Cost Reduction Act (AICRA), L. 1998, c. 21, 22 (codified as amended in various sections of N.J.S.A.). See N.J.S.A. 17:33B-36.1.

Section 64 of the AICRA provides that if an insurer has financial arrangements with one or more automobile body repair shops or a network of facilities, its insureds can select a shop that is not part of the network, provided the out-of-network shop "accepts the same terms and conditions from the insurer, including, but not limited to, price, as the shop, facility, or network with which the insurer has the most generous arrangement." N.J.S.A. 17:33B-36.1. Automobile shops that are not part of the PCC Program do not have to accept NJM's rates, terms, and conditions. If an NJM insured selects a shop that is not part of the PCC Program, and the shop does not agree to use NJM's rates, terms, and conditions, the insured can still use that shop. In that situation, however, NJM informs its insureds that they will have to pay for any difference between

3

what NJM determines to be a reasonable price and the price offered by the licensed repair facility chosen by its insureds.

Plaintiffs contend that NJM has refused to negotiate reasonable rates with them. They also assert that employees and representatives of NJM have steered customers away from using their shops and have encouraged those customers to use repair shops that are part of or accept the rates offered through NJM's PCC Program.

In June 2019, plaintiff Sam Mikhail, on behalf of Quality Auto Painting Center of Roselle, Inc., doing business as Prestige Auto Body (Prestige), and BMR Automotive Service, Inc., doing business as Robbie's Automotive & Collision Specialists (Robbie's), sued NJM and sought to certify a class action. The complaint was thereafter amended twice to include two additional named plaintiffs: 821 Collision, LLC (821 Collision) and Ultimate Collision Repair, Inc. (Ultimate).

In their second amended complaint, plaintiffs assert that NJM engaged in a "pattern and practice" of refusing to negotiate with them in good faith and steering customers away from their shops. They alleged that NJM offered them "take it or leave it" pricing for repair work and then disparaged and retaliated against them when they refused to "capitulate" to NJM's pricing model. In

support of their contentions, plaintiffs identified twenty-six repair claims they contended illustrated NJM's unlawful practices.

Plaintiffs then asserted five causes of action against NJM in their second amended complaint. Specifically, plaintiffs contended that NJM had (1) made injurious falsehoods about them; (2) tortiously interfered with their prospective business advantage; (3) violated the New Jersey Consumer Fraud Act (the CF Act), N.J.S.A. 56:8-1 to -227; (4) violated the New Jersey Antitrust Act (the NJA Act), N.J.S.A. 56:9-1 to -19; and (5) violated the New Jersey Racketeer Influenced and Corrupt Organizations Act (NJ RICO), N.J.S.A. 2C:41-1 to -6.2. Plaintiffs also asserted a claim for injunctive relief, seeking to restrain NJM "from further engaging in the commission or continuation of the unlawful acts described" in the second amended complaint.

Between February 2020 and May 2022, the parties engaged in discovery and filed numerous motions concerning discovery disputes. In May 2022, plaintiffs moved to certify a class. NJM opposed that motion and separately moved for summary judgment, seeking to dismiss all of plaintiffs' claims.

The trial court heard oral argument on the summary judgment motion and the motion to certify a class on September 12, 2022. Thereafter, on November

18, 2022, the court issued a written opinion and order granting summary judgment to NJM and dismissing all claims asserted by plaintiffs with prejudice. In granting summary judgment to NJM, the trial court analyzed each of plaintiffs' five causes of action and the request for injunctive relief. The court determined that plaintiffs had failed to establish certain elements necessary to support each of their claims.

Concerning the CF Act claim, the trial court determined that plaintiffs had not identified any unlawful conduct by NJM; rather, the court reasoned that plaintiffs were complaining that NJM refused to negotiate rates above those it provided through its PCC Program, but NJM was not required to negotiate its rates under section 64 of the AICRA. The trial court also found that plaintiffs had not shown any ascertainable loss to support their CF Act claim.

In dismissing the injurious falsehood claim, the trial court found that plaintiffs had no evidence showing that representatives of NJM knowingly or recklessly published false statements or misrepresentations about plaintiffs. The court also found that there was no evidence that plaintiffs suffered a pecuniary loss resulting from the alleged false statements or misrepresentations.

Addressing plaintiffs' tortious interference claim, the trial court found no evidence that plaintiffs suffered any damages due to NJM's alleged interference.

A-1137-22

The court made a similar finding regarding plaintiffs' NJA Act claim. Additionally, the court reasoned that plaintiffs' NJA Act claim failed because there was no evidence that NJM had decreased or harmed market competition or had created a monopoly in the automobile repair industry.

Addressing plaintiffs' NJ RICO claim, the trial court dismissed that claim because plaintiffs had not identified a separate and distinct enterprise as required by the NJ RICO. Finally, the court found that plaintiffs had not demonstrated the criteria necessary for injunctive relief.

The court thereafter entered orders on November 29, 2022 and December 2, 2022, denying plaintiffs' motions (1) to certify a class and (2) to compel further discovery. The trial court reasoned that both of plaintiffs' motions were moot because it had granted summary judgment to NJM.

Plaintiffs now appeal from the November 18, 2022 order granting summary judgment to NJM.

II.

On appeal, plaintiffs make two primary arguments. First, they contend that the trial court prematurely granted summary judgment to NJM because the parties had not completed discovery. Second, they assert that the trial court

A-1137-22

misapplied the summary judgment standard and erred in dismissing each of their five causes of action and their claim for injunctive relief.

We review a grant of summary judgment de novo, "applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the trial court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

A.    Plaintiffs' Contentions Regarding the Need for Further Discovery.

Plaintiffs contend that the trial court prematurely granted NJM's motion for summary judgment because discovery was incomplete and thereby deprived

them of their due process rights.  In that regard, plaintiffs argue they should be permitted to take depositions, cross-examine witnesses, and obtain outstanding paper discovery to "further expose [NJM's] ongoing and unlawful business practices."

Summary judgment may be "inappropriate prior to the completion of discovery."  Branch v. Cream-O-Land Dairy, 459 N.J. Super. 529, 541 (App. Div. 2019) (quoting Wellington v. Est. of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003)).  Summary judgment, however, can be granted where the non-moving party cannot "demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action."  Ibid. (quoting Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015)); see also Ellis v. Hilton United Methodist Church, 455 N.J. Super. 33, 41 (App. Div. 2018) (explaining that a party opposing summary judgment must "demonstrate with some specificity the discovery sought, and its materiality" (quoting In re Ocean Cnty. Comm'r of Registration, 379 N.J. Super. 461, 479 (App. Div. 2005))).

Plaintiffs have failed to show that further discovery will supply the missing elements of each of their five causes of action.  Accordingly, the trial court did not err in granting summary judgment before discovery was complete.

9

B. Plaintiffs' Claims.

Before analyzing the elements of plaintiffs' alleged causes of action, it is helpful to place this dispute in context. Plaintiffs essentially contend that NJM unlawfully refused to negotiate with them in good faith. The AICRA, and the regulations promulgated under that Act, allow automobile insurers to negotiate financial arrangements with repair shops. N.J.S.A. 17:33B-36.1. NJM negotiated financial arrangements with a network of shops, and those shops all agreed to comply with the rates and conditions offered through the PCC Program. Plaintiffs obviously do not like the prices, terms, and conditions of NJM's PCC Program. If plaintiffs believe that NJM has violated regulations regarding its direct repair program, they have an administrative remedy under the Insurance Trade Practices Act, N.J.S.A. 17:29B-1 to -19, and can apply to the Department of Banking and Insurance, which oversees the regulations related to unfair claim settlement practices. See N.J.S.A. 17:29B-4(9); Pierzga v. Ohio Cas. Grp. of Ins. Cos., 208 N.J. Super. 40, 45, 47 (App. Div. 1986).

In asserting civil and statutory causes of action against NJM, plaintiffs bear the burden of presenting evidence supporting each of the elements of their claims. After almost two years of discovery, plaintiffs were unable to present evidence supporting certain elements of each of their causes of action. They

10

also failed to demonstrate that additional discovery was likely to produce evidence of those missing elements.

1.    The CF Act Claim.

The CF Act, enacted in 1960, and its associated regulations are "designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services." Platkin v. Smith & Wesson Sales Co., 474 N.J. Super. 476, 489 (App. Div. 2023) (quoting Suarez v. E. Int'l Coll., 428 N.J. Super. 10, 32 (App. Div. 2012)).  The CF Act states in relevant part:

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.
>
> [N.J.S.A. 56:8-2.]

To establish a claim under the CF Act, a private plaintiff must prove:  (1) "unlawful conduct by [the] defendant;" (2) "an ascertainable loss by [the] plaintiff;" and (3) "a causal relationship between the unlawful conduct and the

11

ascertainable loss." Gupta v. Asha Enters., L.L.C., 422 N.J. Super. 136, 147 (App. Div. 2011) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)). Unlawful conduct can consist of (1) "an affirmative misrepresentation, even if not made with knowledge of its falsity or with an intent to deceive;" (2) "the knowing omission or concealment of a material fact, accompanied by an intent that others rely upon the omission or concealment;" or (3) "a violation of a specific regulation promulgated under the [CF Act]." Ibid. (quoting Stoecker v. Echevarria, 408 N.J. Super. 597, 623 (App. Div. 2009)).

"Adequately alleging any ascertainable loss is a prerequisite for maintenance of a private action to remedy a violation of the [CF Act]." Id. at 148 (citing Weinberg v. Sprint Corp., 173 N.J. 233, 251 (2002)); see also Robey v. SPARC Grp. LLC, 256 N.J. 541, 555 (2024). In that regard, the CF Act states that: "Any person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . may bring an action . . . in any court of competent jurisdiction." N.J.S.A. 56:8-19. The New Jersey Supreme Court has held that an "ascertainable loss" must be "'quantifiable or measurable,' not 'hypothetical or illusory.'" Robey, 256 N.J. at 555 (quoting D'Agostino v. Maldonado, 216 N.J. 168, 185 (2013)). "[A]n 'estimate of

12

damages, calculated within a reasonable degree of certainty' will suffice to demonstrate an ascertainable loss." Ibid. (quoting Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 249 (2005)). If a plaintiff does not present evidence of an ascertainable loss in opposing a motion for summary judgment, the plaintiff risks dismissal of the cause. Thiedemann, 183 N.J. at 249.

Plaintiffs argue that NJM's unlawful conduct was the practice of refusing to negotiate with plaintiffs in good faith and offering them "take it or leave it" price terms. Plaintiffs also contend that NJM's representatives misled customers into believing that they are not allowed to have their vehicles repaired at certain shops.

Plaintiffs' CF Act claim fails as a matter of law for several reasons. First, section 64 of the AICRA permits NJM to have financial arrangements with automobile body repair shops that accept its prices, terms, and conditions, so long as NJM does not deny insureds the right to select other shops or facilities of their choice. If an insured selects a shop or facility outside of NJM's PCC Program, that shop or facility is required to accept the price and terms of the "shop, facility, or network with which [NJM] has the most generous arrangement." N.J.S.A. 17:33B-36.1. Therefore, if plaintiffs' prices were higher than those of the shops or facilities with which NJM had the most generous

arrangement, it was not unlawful for NJM to continue offering a pricing model that lowers coverage costs for its insureds.

Second, plaintiffs have failed to show that they suffered any ascertainable loss from NJM's pricing model or the alleged misrepresentations made by their representatives. In their appellate brief, plaintiffs point to eleven customers who were allegedly steered away from their shops. The record reflects, however, that all eleven of these customers ultimately used plaintiffs for their repairs. Accordingly, plaintiffs have not shown a quantifiable or measurable loss necessary to maintain an action under the CF Act.

2. The NJA Act Claim.

The NJA Act deems unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State." N.J.S.A. 56:9-3. In that regard, the NJA Act aims to prevent "trade-restraining practices which have tendency to deprive the public of benefits ordinarily derived from a competitive market." EPIX Holdings Corp. v. Marsh & McLennan Cos., 410 N.J. Super. 453, 478 (App. Div. 2009) (quoting Boardwalk Props., Inc. v. BPHC Acquisition, Inc., 253 N.J. Super. 515, 530 (App. Div. 1991)).

To prove a violation of N.J.S.A. 56:9-3, a plaintiff must prove that: (1) the defendants contracted, combined, or conspired with each other; (2) the defendants' combination or conspiracy "produced adverse, anti-competitive effects within the relevant product and geographic markets;" (3) "the objects of and the conduct pursuant to that contract or conspiracy were illegal;" and (4) the plaintiffs suffered an injury proximately caused by the contract, combination, or conspiracy. G & W, Inc. v. Borough of E. Rutherford, 280 N.J. Super. 507, 512-13 (App. Div. 1995); see Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc., 282 N.J. Super. 140, 176-78 (App. Div. 1995). In short, under N.J.S.A. 56:9-3, a plaintiff must prove "the existence of a conspiracy in restraint of trade and either an unlawful purpose or an anti-competitive effect." Patel v. Soriano, 369 N.J. Super. 192, 234 (App. Div. 2004).

To demonstrate a conspiracy in restraint of trade, a plaintiff must "establish a unity of purpose, a common design and understanding, or a meeting of the minds in an unlawful arrangement between, at minimum, two independent, self-interested economic entities." Id. at 235. Such a conspiracy cannot exist between a corporation and its own "employees, who are performing their usual job of formulating and carrying out [the corporation's] managerial

policy." Ibid. (quoting Exxon Corp. v. Wagner, 154 N.J. Super. 538, 545 (App. Div. 1977)).

Plaintiffs argue that NJM engaged in "a sustained effort to purposefully steer customers away" from using plaintiffs' shops, which decreased competition in the marketplace and effectively constituted a "boycott." Plaintiffs again point to alleged misrepresentations made by NJM's representatives in support of this argument.

Plaintiffs failed to demonstrate that NJM engaged in a conspiracy to restrain trade. Plaintiffs have not identified any other "independent, self-interested economic entit[y]," with which NJM allegedly contracted, combined, or conspired. Furthermore, as noted, a conspiracy in restraint of trade cannot exist among NJM and its representatives. See ibid. Accordingly, defendants were entitled to summary judgment on the NJA Act claim.

3. The NJ RICO Claim.

Under the NJ RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." N.J.S.A. 2C:41-

16

2(c).  To assert a cause of action under the NJ RICO, a plaintiff must demonstrate:

> (1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that [the] defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity.
>
> [State v. Ball, 141 N.J. 142, 181 (1995) (quoting State v. Ball, 268 N.J. Super. 72, 99 (App. Div. 1993)).]

N.J.S.A. 2C:41-1(c) defines an "enterprise" as "any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity."  The New Jersey Supreme Court has held that the NJ RICO broadly frames the term "enterprise" to include "any group of persons 'associated in fact'" that "divides among its members the tasks that are necessary to achieve a common purpose."  Ball, 141 N.J. at 160, 162.  In that regard, the Court has explained that the "division of labor and the separation of functions undertaken by [a group's members] serve as the distinguishing marks" of an enterprise because "when a group does so divide and assemble its labors . . . to accomplish its criminal purposes, it must necessarily engage in a high degree of planning, cooperation and coordination."  Id. at 162.

A-1137-22

"A 'pattern of racketeering activity' requires two predicate acts, N.J.S.A. 2C:41-1(d)(1), that have 'either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents,' N.J.S.A. 2C:41-1(d)(2)." Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., L.L.C., 450 N.J. Super. 1, 37 (App. Div. 2017) (citations reformatted). The predicate acts constituting "racketeering activity" must be criminal offenses and can include any conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1)(A), (B), and (D). Fairfax Fin. Holdings, 450 N.J. Super. at 37; see also N.J.S.A. 2C:41-1(a)(1) (enumerating criminal offenses); N.J.S.A. 2C:41-1(a)(2) (adopting the federal definition of "racketeering activity").

Plaintiffs assert that NJM and its employees "acted in concert to engage in a pattern of 'racketeering activity' by deliberately steering customers" to other automobile body repair shops and by "failing to negotiate" with plaintiffs in good faith. In their second amended complaint, plaintiffs contend that NJM's pattern of racketeering activity consisted of violations of 18 U.S.C. § 1961(1), including wire fraud in violation of 18 U.S.C. § 1343.

Plaintiffs have failed to demonstrate the existence of an enterprise or a pattern of racketeering activity necessary to establish a claim under the NJ

A-1137-22

RICO. In naming only NJM as a defendant, plaintiffs cannot now assert that NJM and its employees are a group of persons "associated in fact" that divided its labors and functions to accomplish criminal purposes. Furthermore, aside from the conclusory allegations of wire fraud and violations of 18 U.S.C. § 1961(1) in their complaint, plaintiffs have not presented any evidence that NJM committed two predicate acts enumerated in N.J.S.A. 2C:41-1(a)(1) to (2). Accordingly, plaintiffs have not provided evidence sufficient to support certain elements of a violation of the NJ RICO, and, therefore, NJM was entitled to summary judgment on this cause of action.

4. The Injurious Falsehood Claim.

An injurious falsehood is "any false statement that causes pecuniary loss." Fairfax Fin. Holdings, 450 N.J. Super. at 52; see also Restatement (Second) of Torts § 623A (Am. L. Inst. 1976) (explaining that an individual is liable if he or she publishes a statement with knowledge or in reckless disregard of its falsity and with intent "to result in harm to interests of the other having a pecuniary value"). To establish a claim of injurious falsehood, a plaintiff must prove "publication of a matter derogatory to the plaintiff's property or business, of a kind designed to prevent others from dealing with him [or her] or otherwise to interfere with plaintiff's relations with others." Patel, 369 N.J. Super. at 246-47.

A-1137-22

The false statement "must be made to a third person and must play a material part in inducing others not to deal with [the] plaintiff." Id. at 247. Proof of damages is "essential" in an action for injurious falsehood. Ibid.

Plaintiffs contend that NJM made "misrepresentations and aspersions" during the "claims intake process" to prevent or dissuade insureds from dealing with plaintiffs. In that regard, plaintiffs contend that NJM's representatives advised insureds that (1) Robbie's charges more than NJM pays for claim settlements and that insureds would be responsible for the difference in price; (2) Robbie's labor rates are "excessive" and NJM would not pay them; (3) NJM would not obtain an agreed price with Robbie's because Robbie's does not always accept NJM's "unilateral" price; and (4) Robbie's charges administration fees in some circumstances. Plaintiffs argue these alleged misrepresentations evinced a "reckless disregard for the truth and a disparagement to [their] businesses" because NJM's representatives made these statements prior to attempting to negotiate with plaintiffs in good faith as required by N.J.A.C. § 11:3-10.3.

Plaintiffs have failed to show that these statements were false or that NJM's representatives made these statements with knowledge or in reckless disregard of their falsity. In fact, the record reflects that Robbie's charged more

20

for labor than NJM was willing to pay and that Robbie's did charge administration fees in some circumstances. Moreover, plaintiffs have failed to show that any of the eight statements allegedly made to insureds and highlighted in their brief resulted in damages because all eight insureds chose plaintiffs' facilities for their repair work. Accordingly, plaintiffs have failed to provide sufficient evidence to support the elements of an injurious falsehood, and, therefore, NJM was also entitled to summary judgment on this claim.

5.     The Tortious Interference Claim.

"The tort of interference with a business relation or contract contains four elements:  (1) a protected interest; (2) malice—that is, [a] defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." Vosough v. Kierce, 437 N.J. Super. 218, 234 (App. Div. 2014) (quoting DiMaria Constr., Inc. v. Interarch, 351 N.J. Super. 558, 567 (App. Div. 2001)).  Where a plaintiff's loss of business is "merely the incident of healthy competition, there is no compensable tort injury." Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306 (2001) (quoting Ideal Dairy Farms, 282 N.J. Super. at 199).

Plaintiffs allege that NJM unlawfully steered plaintiffs' current and prospective customers to other automobile body repair shops by making false

claims about plaintiffs. Plaintiffs point to statements that NJM's agents made to insureds about plaintiffs' higher labor costs and fees as evidence that NJM intentionally interfered with plaintiffs' business relations with insureds. These conclusory allegations, however, do not demonstrate that NJM acted with malice. Plaintiffs have failed to allege any facts evidencing that NJM intentionally asserted falsehoods to interfere with plaintiffs' relationships with insureds. Nor have plaintiffs demonstrated a reasonable likelihood that any loss of business was a result of the statements made by NJM's representatives as opposed to healthy market competition. Instead, the record on appeal demonstrates that none of the individuals alleged to have been steered by NJM were denied the opportunity to use the shop of their choice. In fact, all eleven insureds that plaintiffs focus on ultimately used plaintiffs' shops for their repair work.

Furthermore, plaintiffs assert that they "lost business" as a result of defendant's conduct and that they have sustained and will continue to sustain "substantial damages in an amount to be proven at trial." In that regard, plaintiffs argue they are entitled to further discovery to determine the scope of damages resulting from NJM's alleged tortious interference. As the trial court correctly noted, plaintiffs have failed to proffer any evidence of the damages

22

they suffered from NJM's alleged tortious interference. Plaintiffs also failed to demonstrate with specificity that further discovery will supply the missing elements of the cause of action for tortious interference with a prospective business gain. Accordingly, NJM was entitled to summary judgment on the claim of tortious interference.

6. The Claim for Injunctive Relief.

Lastly, plaintiffs seek injunctive relief "restraining [NJM] from further engaging in the commission or continuation of the unlawful acts" described in their second amended complaint. As plaintiffs have failed to assert viable causes of action against NJM, there is no basis for awarding an injunction. See Crowe v. De Gioia, 90 N.J. 126, 133-34 (1982); Rinaldo v. RLR Inv., LLC, 387 N.J. Super. 387, 397 (App. Div. 2006) (explaining that a plaintiff must "establish[] the liability of the other party" to be awarded permanent injunctive relief).

### III.

In summary, our de novo review of the record establishes that plaintiffs have failed to present sufficient evidence supporting each of their five claims. Accordingly, we affirm the November 18, 2022 order granting summary judgment to NJM and dismissing with prejudice plaintiffs' claims.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23

A-1137-22